STATE OF NORTH CAROLINA v. JAKIE HAMMONDS

No. COA00-89

(Filed 29 December 2000)

**1. Constitutional Law— right to speedy trial—pretrial delay**

A defendant in a first-degree murder case was not deprived of his constitutional right to a speedy trial even though he was incarcerated without bond for over four and a half years before trial, because: (1) the record reveals that the local docket was congested with capital cases, and congestion of criminal dockets is a valid justification for delay; (2) there is no indication in the record that the prosecutor's decisions pertaining to scheduling and trial order were based upon unconstitutional factors; (3) defendant's counsel represented one of the defendants in the "exceptional" case for a murder that occurred after defendant's event for which he was charged but tried ahead of this case, and defense counsel also represented defendants in many other cases on the docket; (4) defendant's action of asserting his right to a speedy trial four years and two days after he was arrested was not consistent with a desire for speedy trial; and (5) defendant did not suffer prejudice as a result of the delay although the State's principal investigator died and two key witnesses changed their description of events prior to trial since hardly a criminal case exists where defendant could not make these general averments of impaired memory and lost witnesses. U.S. Const. amend. VI; N.C. Const. art. I, § 18.

**2. Constitutional Law— right to timely appeal—numerous extensions of time for transcript**

A defendant in a first-degree murder case was not improperly denied a timely appeal in violation of his right to due process even though the State failed to provide the transcript necessary for his appeal for another two and a half years based on the court reporter filing a number of motions for extension of time to produce the transcript, because: (1) the Court of Appeals consistently approved the reporter's requests for extensions of time; (2) defendant's mental burden did not affect his ability ultimately to perfect the appeal and bring forth the issues he sought to have decided; and (3) the transcript eventually prepared and made available to the parties was adequate to allow full development of appeal issues.

**3. Appeal and Error— incomplete transcript—adequacy for appeal**

The transcript of defendant's trial in a first-degree murder case that was stipulated to be incomplete, based on the fact that portions of the record could not be reconstructed due to poor recordation and unclear or missing stenographic outlines, was adequate to allow defendant to assign and brief all preserved issues, because: (1) in most instances it is possible to reconstruct the substance of what was said, even if the precise words are lost; (2) when argument of counsel or the court's reason for a holding are lost, the fact of the objection and the subsequent ruling are evident; (3) the context of purportedly objectionable evidentiary rulings can be reconstructed; and (4) the transcript, despite its imperfections, is not so inaccurate as to prevent meaningful review by the Court of Appeals.

**4. Evidence— husband-wife privilege—not confidential marital communications**

The trial court did not err in a first-degree murder case by allowing defendant's wife to testify on cross-examination to alleged confidential marital communications allegedly in violation of N.C.G.S. § 8-57, because: (1) defendant failed to make a timely objection to two of the statements as required by N.C. R. App. P. 10(b)(2); (2) the wife's statement during cross-examination that cable workers were outside was at most a casual observation not induced by the marital relationship and prompted by the affection, confidence, and loyalty engendered by such relationship; (3) the wife's statement during cross-examination that she observed defendant remove a firearm from under their bed was not induced by or even part of the marital relationship, defendant took no steps to ensure confidentiality while obtaining the weapon, and the wife's presence in the bedroom to watch defendant arm himself was incidental; and (4) the wife's statement during cross-examination that defendant told her what he had done to the victim cannot be considered the disclosure of a confidential marital communication since the wife did not reveal the content of any communication between herself and defendant, and defendant's brother was also told what happened.

**5. Homicide— first-degree murder—short-form indictment**

Although the short-form murder indictment used to charge defendant with first-degree murder did not allege premeditation and deliberation nor felony murder, the trial court did not err by

concluding the indictment did not violate defendant's right to due process because it complies with the requirements of N.C.G.S. § 15-144.

Judge GREENE dissenting.

Appeal by defendant from judgment entered 10 March 1997 by Judge D. Jack Hooks, Jr., in Robeson County Superior Court. Heard in the Court of Appeals 12 September 2000.

*Michael F. Easley, Attorney General, by Steven M. Arbogast, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Janet Moore, Assistant Appellate Defender, for defendant-appellant.*

EDMUNDS, Judge.

Defendant appeals his conviction of first-degree murder. We find no error.

On the morning of 24 July 1992, Charles Pickens (Pickens) and the victim, Allen Graham (Graham), were installing cable television lines in the vicinity of defendant's home. They parked near defendant's lawn, unloaded an all-terrain vehicle, referred to in the transcripts as a four-wheeler, and began unrolling cable. Shortly thereafter, defendant confronted the two men and pointed a shotgun at them while telling them that they were trespassing on his property. Graham began to re-roll the cable in preparation to leave and said to defendant, "Can we talk——." Before Graham could complete his sentence, defendant shot him in the face. Graham fell behind the trailer, and defendant·ran back into his house. Pickens fled and heard three more shots fired as he ran.

Pickens reached a nearby school where he encountered Peggy Locklear and told her "[m]y buddy's been shot." Peggy Locklear noticed that Pickens was muddy and smelled of gunpowder. Shortly afterwards, she observed a vehicle, which was later identified as belonging to defendant, speeding up and slowing down in front of the school. When Pickens returned to the scene of the shooting, he observed that Graham's body was at the driver's side of the truck, and the door to their vehicle was open. Both back windows to the vehicle had been damaged by gunshots, and there was a trail of blood from the back of the truck to Graham's body.

At defendant's trial, Melanie Graham, the victim's wife, corroborated Pickens' version of events by testifying as to what he told her had happened that day. Anthony Thompson, a detective with the Robeson County Sheriff's Department, testified that three firearms were recovered from the trunk of defendant's vehicle at the time of his arrest. Thomas Trochum, a special agent with the North Carolina State Bureau of Investigation, tested the recovered firearms and determined that one had been used to shoot Graham. Stuart McPhatter (McPhatter), a deputy sheriff with the Robeson County Sheriff's Department, testified that when he arrived at the crime scene, he saw the body of Graham on his knees between the door of his truck and the inside of the door. McPhatter collected four waddings and a shotgun shell near the truck. Dr. Marvin Thompson, a pathologist who performed an autopsy on Graham, concluded that Graham bled to death from a shotgun wound to the face. He added that a person suffering such a wound could have walked or crawled a few yards.

Two former neighbors of defendant, Terry Chavis (Chavis) and Randy Locklear, testified as to statements defendant made regarding those trespassing on his land. Defendant told Chavis on 23 July 1992 that the cable people wanted to put cable lines on his property and that he "better not catch them over there on my land." Defendant told Randy Locklear that he wanted to kill a Jeep driver who had trespassed on his property. Willie Ray Chavis also testified that approximately one week before the shooting, defendant told him that:

> [H]e could kill somebody and hide them in the acres in the neck of the woods back there and nobody would never find them, nobody would ever find out that he had killed anybody. He told me if he got caught killing somebody, he would go to jail two or three years, plead insanity and be out, and the jail wasn't nothing but a vacation, anyhow.

Finally, defendant's wife, Doreen Hammonds (Mrs. Hammonds) testified during the State's case in chief that she and defendant were in the bedroom when Graham and Pickens arrived on 24 July 1992. She heard defendant outside arguing with both men. When she heard a gunshot, she hid in the corner of the bedroom.

Defendant presented evidence tending to show that he suffered from various mental disorders and was very protective of his property. Timmy Hunt, a former neighbor, stated that defendant dug a trench in the road in front of his property and placed a "private prop-

erty" sign on a pole at the edge of his yard. He further testified that he had never seen defendant confront anyone on his property. Carlie and Priscilla Locklear, also former neighbors, testified that defendant was bothered by four-wheelers in his yard and had placed barriers on his property. Both stated that defendant suffered from mood swings and appeared to have a mental problem.

Mrs. Hammonds was called as a defense witness and testified as to defendant's frustration with four-wheelers and his mental problems. She stated that defendant had nightmares the week before the shooting and could not sleep. She also testified that there was a "private property" sign on the pole in front of their yard, a "no tres-passing" sign attached to a chain across their driveway, and that defendant had placed a board studded with nails in the trench in the road.

When cross-examined by the State, Mrs. Hammonds testified that on the morning of 24 July 1992, she saw a truck and told defendant that the cable people were outside. She heard defendant cursing and apparently observed defendant obtain a gun from beneath the bed.[1] In addition, she testified that she was scared of her husband and that she had previously seen him use guns to confront people in the road. When asked if defendant had told her after the shooting what he had done, she answered in the affirmative.

Dr. Shelley Snead, assistant professor of psychiatry at East Carolina University, interviewed defendant and reviewed his medical records, police reports, an investigative report, an autopsy report, and a transcript of a telephone conversation between defendant and his wife. She gave defendant a primary diagnosis of personality disorder with paranoid features and provisional borderline intellectual functioning, and a secondary diagnosis of intermittent explosive disorder and alcohol dependence, remission in a closed environment. In her opinion, defendant was not malingering and did not have the ability to form a specific intent to kill on 24 July 1992.

Mona Jacobs, defendant's sister, testified that she had observed mood changes in her brother after the death of their stepfather. She stated that she visited defendant the week before 24 July 1992 and told him that he might need to seek some help because he appeared

---

1. Mrs. Hammond's testimony on this point is ambiguous. "Q: Did you see [defendant] when he came back in the bedroom and got the gun out from under the bed? A: Yes, I seen him when he came back in the bedroom."

agitated and nervous. In addition, she testified to the poor living conditions and abuse that she and defendant suffered as children.

Defendant was arrested on 25 July 1992 and has remained incarcerated since that date. He was indicted on 1 February 1993 for first-degree murder. Approximately three and a half years after his indictment, defendant filed a motion for speedy trial requesting that his case be brought to trial within sixty days or, in the alternative, be dismissed with prejudice. The trial court granted defendant's motion on 18 November 1996 and ordered that defendant's trial begin before 1 March 1997. Defendant did not object to this form of relief.

Defendant's trial commenced on 3 February 1997. On 6 March 1997, the jury found defendant guilty of first-degree murder and thereafter recommended life imprisonment without parole. Defendant filed notice of appeal on 17 March 1997. The court reporter filed a series of motions for extension of time to produce a transcript of the trial court proceedings. On 26 January 1999, 26 February 1999, and 16 March 1999, defendant filed motions for new trial due to the court reporter's failure to produce the transcript. Defendant obtained the transcript after a series of extensions covering two and a half years, and the record on appeal was filed on 20 January 2000.

I.

Defendant first contends that he was deprived of his constitutional right to a speedy trial, arguing that his incarceration without bond for over four and a half years before trial, followed by the State's failure to provide the transcript necessary for his appeal for another two and a half years, violated his rights to a speedy trial, access to the courts, due process, equal protection of the law and other rights guaranteed by the United States and North Carolina Constitutions. Accordingly, defendant asks that his conviction be vacated and the murder charge dismissed with prejudice.

[1] We begin with an analysis of the pretrial delay. The Sixth Amendment to the United States Constitution and the fundamental law of this State provide every individual formally accused of a crime the right to a speedy trial. *See, e.g., State v. Lyszaj*, 314 N.C. 256, 261, 333 S.E.2d 288, 292 (1985). The Sixth Amendment states, in relevant part, "[i]n all criminal prosecutions the accused shall enjoy the right to a speedy . . . trial." U.S. Const. amend. VI. This provision is made applicable to the states by the Fourteenth Amendment. *See Klopfer v. North Carolina*, 386 U.S. 213, 222, 18 L. Ed. 2d 1, 8 (1967). Likewise,

Article I, Section 18 of the North Carolina Constitution provides that "all courts shall be open to every person . . . without favor, denial or delay." N.C. Const., Art. 1, 18. The same analysis is employed under both the Sixth Amendment and Article I when reviewing speedy trial claims. *See State v. Flowers*, 347 N.C. 1, 489 S.E.2d 391 (1997).

In *Barker v. Wingo*, 407 U.S. 514, 33 L. Ed. 2d 101 (1972), the United States Supreme Court established a balancing test involving four interrelated factors for courts to conduct on a case by case basis in determining whether a defendant's constitutional right to a speedy trial has been violated. *See id.* at 530, 33 L. Ed. 2d at 116-17. These factors include: (1) the length of the delay; (2) the reason for the delay; (3) defendant's assertion of his right to a speedy trial; and (4) prejudice to defendant resulting from the delay. *See id.*

> We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process. But, because we are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution.

*Id.* at 533, 33 L. Ed. 2d 118-19.

North Carolina courts have adopted these standards in analyzing alleged speedy trial violations. *See State v. Bare*, 77 N.C. App. 516, 335 S.E.2d 748 (1985). In addition, our Supreme Court has stated:

> The right to a speedy trial is different from other constitutional rights in that, among other things, deprivation of a speedy trial does not *per se* prejudice the ability of the accused to defend himself; it is impossible to determine precisely when the right has been denied; it cannot be said precisely how long a delay is too long; there is no fixed point when the accused is put to a choice of either exercising or waiving his right to a speedy trial; and dismissal of the charges is the only possible remedy for denial of the right to a speedy trial.

*State v. McKoy*, 294 N.C. 134, 140, 240 S.E.2d 383, 388 (1978) (citation omitted). With these principles in mind, we now balance the four factors considering the evidence in this case.

## A. Length of Delay

"[A] defendant's right to a speedy trial attaches upon being formally accused of criminal activity, by arrest or indictment." *State v. Pippin*, 72 N.C. App. 387, 391, 324 S.E.2d 900, 904 (1985) (citations omitted). The length of time that is appropriate between formal accusation and trial in each case is initially within the discretion of the trial court. *See id.* at 392, 324 S.E.2d at 904.

As to this factor, our courts have noted that "some delay is inherent and must be tolerated in any criminal trial; for example, the state is entitled to an adequate period in which to prepare its case for trial." *Id.* at 391-92, 324 S.E.2d at 904 (internal citations omitted); *see also McKoy*, 294 N.C. at 141, 240 S.E.2d at 388. Consequently, "[t]he length of a delay is not determinative of whether a violation has occurred." *Bare*, 77 N.C. App at 519, 335 S.E.2d at 750 (citing *State v. Jones*, 310 N.C. 716, 721, 314 S.E.2d 529, 533 (1984)). Rather,

> [t]he length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case.

*Barker*, 407 U.S. at 530-31, 33 L. Ed. 2d at 117. Because the length of delay is viewed as a triggering mechanism for the speedy trial issue, "its significance in the balance is not great." *State v. Hill*, 287 N.C. 207, 211, 214 S.E.2d 67, 71 (1975).

Although the United States Supreme Court has not set a definite period for which a delay will be deemed presumptively prejudicial, it has noted:

> Depending on the nature of the charges, the lower courts have generally found postaccusation delay "presumptively prejudicial" at least as it approaches one year. We note that, as the term is used in this threshold context, "presumptive prejudice" does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry.

*Doggett v. United States*, 505 U.S. 647, 652 n.1, 120 L. Ed. 2d 520, 528 n.1 (1992) (internal citations omitted).

In the present case, defendant was arrested on 25 July 1992 and tried on 3 February 1997. The delay of approximately four and a half years, well over the one year set forth in *Doggett*, is presumptively prejudicial. *See, e.g., State v. Webster*, 337 N.C. 674, 679, 447 S.E.2d 349, 351 (1994) ("[w]hile not enough in itself to conclude that a constitutional speedy trial violation has occurred, [a sixteen month] delay is clearly enough to cause concern and to trigger examination of the other factors"); *Hill*, 287 N.C. at 211, 214 S.E.2d at 71 (delay of twenty-two months sufficient to trigger examination of other factors); *State v. Avery*, 95 N.C. App. 572, 577, 383 S.E.2d 224, 226 (1989), *appeal dismissed*, 326 N.C. 51, 389 S.E.2d 96 (1990) (delay of two and a half years enough to trigger analysis of other factors). However, because this Court does not "determine the right to a speedy trial by the calendar alone," *State v. Wright*, 290 N.C. 45, 51, 224 S.E.2d 624, 628 (1976) (citation omitted), we must now consider this delay in relation to the three remaining factors.

## B. Reason for Delay

In analyzing this factor, our courts have held that:

> The constitutional guarantee does not outlaw good-faith delays which are reasonably necessary for the State to prepare and present its case. . . . Neither a defendant nor the State can be protected from prejudice which is an incident of ordinary or reasonably necessary delay. The proscription is against purposeful or oppressive delays and those which the prosecution could have avoided by reasonable effort.

*State v. Johnson*, 275 N.C. 264, 273, 167 S.E.2d 274, 280 (1969) (internal citations omitted). "The burden is on an *accused* who asserts the denial of his right to a speedy trial to show that the delay was due to the neglect or willfulness of the prosecution." *Id.* at 269, 167 S.E.2d at 278 (emphasis added).

Defendant argues that the delay between his arrest and trial was caused in part by the State's "laggard performance." The record, however, reveals that the local docket was congested with capital cases. The trial court described it as "chopped the block [sic] with capital cases. They're trying two at a time and just one right after the other, and there are only so many that can be tried." "Our courts have consistently recognized congestion of criminal court dockets as a valid justification for delay." *State v. Hughes*, 54 N.C. App. 117, 119, 282 S.E.2d 504, 506 (1981) (citations omitted) (finding defendant

failed to meet his burden where delay was result of backlog of cases). Indeed, "[b]oth crowded dockets and lack of judges or lawyers, and other factors, make some delays inevitable." *State v. Brown*, 282 N.C. 117, 124, 191 S.E.2d 659, 664 (1972) (citation omitted). Accordingly, in assessing defendant's speedy trial claim, we see no indication that court resources were either negligently or purposefully underutilized.

Defendant also argues that the delay between his arrest and trial was caused by the State's procedure of choosing more recent cases for earlier trial. In this regard, defendant claims that he received unequal treatment because the highly publicized capital murder case involving the death of Michael Jordan's father, though occurring after the event for which he was charged, was designated "exceptional" and tried ahead of his. However, such a designation is made by the Chief Justice, not by the prosecutor.[2] *See* Gen. R. Pract. Super. and Dist. Ct. 2.1, 1999 Ann. R. N.C. 3. In addition, our Supreme Court has acknowledged that a prosecutor may exercise selectivity in preparing the trial calendar and "the exercise of this prosecutorial prerogative does not reach constitutional proportion unless there be a showing that the selection was deliberately based upon 'an unjustifiable standard such as race, religion or other arbitrary classification.' " *State v. Cherry*, 298 N.C. 86, 103, 257 S.E.2d 551, 562 (1979) (citation omitted). In the case at bar, there is no indication in the record that the prosecutor's decisions pertaining to scheduling and trial order were based upon unconstitutional factors. Finally, the record reveals that defendant's counsel represented one of the defendants in the "exceptional" case cited above and represented defendants in many other cases on the docket. In light of these reasons, we conclude that the delay was due to neutral factors, and defendant failed to carry his burden to show delay due to neglect or wilfulness of the State. *See, e.g., State v. Heath*, 77 N.C. App. 264, 268, 335 S.E.2d 350, 353 (1985), *rev'd on other grounds*, 316 N.C. 337, 341 S.E.2d 565 (1986) (finding that defendant did not meet burden where delay was "due primarily to congested court dockets and the unavailability, for various reasons, of defendant's trial counsel").

C. Assertion of Right

Regarding this factor, the United States Supreme Court has stated:

---

2. The record does not reveal who recommended the case to the Chief Justice for designation as "exceptional."

The more serious the deprivation, the more likely a defendant is to complain. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. *We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.*

*Barker*, 407 U.S. at 531-32, 33 L. Ed. 2d at 117-18 (emphasis added); *see also Doggett*, 505 U.S. 647, 120 L. Ed. 2d 520 (observing that if defendant knew of his indictment years before he was arrested and failed to invoke his right to a speedy trial, this factor "would be weighed heavily against him"). Likewise, our courts have noted that a "[d]efendant's failure to assert his right to a speedy trial sooner in the process does not foreclose his speedy trial claim, but does weigh against his contention that he has been denied his constitutional right to a speedy trial." *Flowers*, 347 N.C. at 28, 489 S.E.2d at 407 (citing *Webster*, 337 N.C. at 680, 447 S.E.2d at 352).

In the present case, defendant first asserted his right to a speedy trial on 23 July 1996, four years and two days after he was arrested. He was tried approximately six months later. Although defendant argues in his appellate brief that he "wanted his case to come to trial, and was upset that instead his attorney, the local Public Defender, was preoccupied trying cases of more recent origin," "the State cannot be charged with knowledge of communication between the attorney and his client." *State v. Roberts*, 22 N.C. App. 579, 582, 207 S.E.2d 373, 376, *aff'd in part and rev'd in part*, 286 N.C. 265, 210 S.E.2d 396 (1974). Defendant's actions were not consistent with a desire for speedy trial. Accordingly, his delay in seeking a speedy trial is weighed against him.

## D.  Prejudice to Defendant

Finally, we consider whether defendant has suffered prejudice as a result of the delay of his trial. As to this factor, the United States Supreme Court has recognized three objectives of the right to a speedy trial: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532, 33 L. Ed. 2d at 118 (citation omitted). In his appellant brief, defendant only asserts that he has been prejudiced by the third factor. In this regard, "the test for prejudice is whether significant evidence or testimony that would have been helpful to the defense was lost due to

STATE v. HAMMONDS

[141 N.C. App. 152 (2000)]

delay." *State v. Jones*, 98 N.C. App. 342, 344, 391 S.E.2d 52, 54-55 (1990) (citation omitted). Although defendant contends that he need not demonstrate prejudice resulting from the delay to obtain relief, citing *Doggett*, 505 U.S. 647, 120 L. Ed. 2d 520, the holding of *Doggett* is that the need to demonstrate prejudice diminishes as the egregiousness of the delay increases. "[T]o warrant granting relief, negligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice." *Id.* at 657, 120 L. Ed. 2d at 532. Nevertheless, "[c]ourts will not presume that a delay in prosecution has prejudiced the accused. The defendant has the burden of proving the fourth factor." *Hughes*, 54 N.C. App. at 120, 282 S.E.2d at 506. As noted above, the delay in the case at bar, albeit extended, was not the result of unjustifiable or unconstitutional factors.

Defendant contends that he was prejudiced by the death of the State's principal investigator and by the fact that two key witnesses changed their description of events prior to trial. Our Supreme Court has noted that "[h]ardly a criminal case exists where the defendant could not make these general averments of impaired memory and lost witnesses." *State v. Dietz*, 289 N.C. 488, 493, 223 S.E.2d 357, 361 (1976) (citation omitted); *see also State v. Goldman*, 311 N.C. 338, 345, 317 S.E.2d 361, 365 (1984) (noting that "[d]efendant's only allegations of prejudice concern claims of faded memory and evidentiary difficulties inherent in any delay"). Indeed,

> [p]assage of time, whether before or after arrest, may impair memories, cause evidence to be lost, deprive the defendant of witnesses, and otherwise interfere with his ability to defend himself. But this possibility of prejudice at trial is not itself sufficient reason to wrench the Sixth Amendment from its proper context.

*United States v. Marion*, 404 U.S. 307, 321-22, 30 L. Ed. 2d 468, 479 (1971).

The absence of a principal investigator is generally not considered by defendants to be bad news. In the case at bar, defendant argues that his ability to present facts favorable to his defense theory was impaired because the investigator had died. However, the record reveals that the State presented other investigators who testified to the same events and observations sought by defendant, and defendant was able to impress upon the jury the absence of the detective

best able to testify as to certain events and observations. As we noted in *State v. Shelton*, 53 N.C. App. 632, 281 S.E.2d 684 (1981), *appeal dismissed*, 305 N.C. 306, 290 S.E.2d 707 (1982) "[i]t is impossible for us to say what prejudice, if any, was caused by the unavailability of [a] witness [because] [w]e do not know what his testimony would have been." *Id.* at 638, 281 S.E.2d at 690. In addition, the fact that two other witnesses changed their version of events could occur at any trial; such circumstances are not an inevitable consequence of delay. While we do not condone a delay as protracted as that in the case at bar, upon applying the balancing test required by *Barker*, we are unable to hold that defendant was denied his constitutional right to a speedy trial.

[2] Defendant also contends that he was improperly denied a timely appeal. Although our research has found no North Carolina case on point, nor have we found any case from the United States Supreme Court recognizing a constitutional right to a speedy appeal, we agree with the holding in the United States Court of Appeals for the Fourth Circuit that "undue delay in processing an appeal *may* rise to the level of a due process violation." *United States v. Johnson*, 732 F.2d 379, 381 (4th Cir. 1984) (citations omitted). Determining whether a particular delay reaches the level of a due process violation requires an analysis of the factors enunciated in *Barker. See id.*

The length of the delay, approximately two and a half years, while not so unsettling as the protracted pretrial delay in this case, is nevertheless sufficient to trigger the examination of the remaining factors. The reason for the delay is troublesome. According to the record, the court reporter filed a number of motions for extension of time to produce the transcript, citing plausible excuses. This Court granted a number of extensions and enlargements of time in 1997 and 1999. Finally, the Administrative Office of the Courts had to intervene, the computer disks and transcription notes were obtained from the reporter, and a substitute reporter prepared the trial transcript. Although none of the delay is attributable to defendant, in light of the fact that this Court consistently approved the reporter's requests for extensions of time, we are equally unable to find that the delay is attributable to the prosecution. *See id.* at 382

As to the third factor, there is no question that defendant made a timely assertion of his right to a speedy appeal. Finally, we must consider any prejudice suffered by defendant. His anxiety over the outcome of the appeal is not a factor that we weigh heavily because any

STATE v. HAMMONDS

[141 N.C. App. 152 (2000)]

convicted defendant is subject to such anxiety. Although defendant's mental burden may have been increased because of the protracted appeal, that burden did not affect his ability ultimately to perfect the appeal and bring before this Court the issues he sought to have decided. In addition, defendant claims that the delay resulted in an inaccurate and incomplete transcript. As we discuss more fully below, the transcript eventually prepared and made available to the parties was adequate to allow full development of appeal issues.

Accordingly, we hold that defendant did not suffer unconstitutional delay of either a speedy trial or a speedy appeal. This assignment of error is overruled.

## II.

[3] Defendant next contends that the incomplete transcript of his trial violates his constitutional and statutory rights entitling him to a new trial. He additionally argues that the transcript is inaccurate, citing some hundred places in which the transcript bears the notation "unable to reconstruct the record." Defendant claims that he "is prejudiced by *every* instance in which appellate counsel and this Court are forced to operate in the dark."

On 20 January 1999, the parties:

stipulated and agreed that a transcript of the proceedings to the trial tribunal, consisting of four thousand one hundred eighty-five (4185) pages bound in twenty-two (22) volumes along with concordances of ninety-two (92) pages bound in six (6) volumes, is incomplete in that portions of the record could not be reconstructed due to poor recordation and unclear or missing stenographic outlines and the portions prepared by Court Reporters Pamela A. Mayo and Deborah Cashion are certified as accurate only to the best of those Reporters' abilities.

We acknowledge that the omissions in the transcript increase defendant's difficulties in arguing his case on appeal. Nevertheless, we have conducted a careful review of the entire trial transcript through the jury verdict (we have not reviewed the sentencing portion, in light of the life sentence recommended by the jury) and have scrutinized with particularity those areas cited by defendant as so garbled and incomplete as to prevent him from raising issues on appeal. On the basis of this review, we conclude that the transcript was adequate to allow defendant to assign and brief all preserved issues.

Defendant contends he is unable to argue that the trial court may have committed error pursuant to *State v. Harbison*, 315 N.C. 175, 337 S.E.2d 504 (1985), relating to his consent to his attorney's opening statement, in which his attorney conceded that defendant had committed certain acts. Our review of the transcript reveals that while part of the bench conference between the trial judge and defense counsel could not be retrieved, the court's ensuing colloquy with defendant before opening statement, during which the court discussed the proposed statement and defendant gave his approval, is complete; in addition, at the conclusion of defense counsel's opening statement, the trial judge again addressed defendant about the statement, giving defendant an opportunity to voice any objection to what his counsel had said. Accordingly, this issue was sufficiently preserved in the record to allow defendant to have raised and argued it on appeal.

Defendant contends that the incomplete nature of the transcript prevents him from arguing numerous evidentiary rulings. Specifically, defendant states that he is unable to raise in this appeal issues relating to: (1) late discovery pertaining to defendant's marital relationship; (2) the prosecution's displaying to the jury allegedly unrelated weapons seized from defendant; (3) possible impeachment of an investigating deputy and a technician; (4) display of gory photographs to the jury; (5) impermissible testimony pertaining to "bad acts," other hearsay, and irrelevant testimony; and (6) objections by the State to evidence of defendant's mental illness and instability. Our review of the record, both the portions to which defendant refers us and the surrounding material that give context to the missing parts, satisfies us that while some specific portions of the record are indeed lost, in every case the context of the purportedly objectionable rulings can be reconstructed. For example, as to the prosecution's display of weapons to the jury, the record suggests that trial counsel was momentarily confused as to which weapon bore which exhibit number. However, that uncertainty was promptly resolved, and the substance of defendant's objection and the court's ruling are unambiguous. Similarly, while the objection itself pertaining to evidence of defendant's mental illness and instability are confusing because of omitted portions, the subsequent *voir dire* sufficiently sets out the contested issue.

Defendant also argues that the incomplete transcript impairs his ability to appeal alleged violations of his right to assist in his defense. Defendant first cites a portion of the transcript in which the trial

STATE v. HAMMONDS

[141 N.C. App. 152 (2000)]

court read the names of potential jurors. Although some names are evidently missing from the transcript, even if the names were not available through the office of the clerk of court in the district of trial, defendant has failed to cite any authority to support his assertion that he is now entitled to the names of those in the jury pool, nor are we aware of any such authority. Moreover, any names missing from this roll call must have been names of those in the pool who were never called to the jury box, for the transcript includes the *voir dire* of each individual questioned as a potential juror. Defendant also contends that the record's condition prevents him from determining "the basis for the overruling of Defendant's objection to instruction of potential jurors outside of his presence." However, the record reflects the court's ruling and the court's statement that it was making the ruling in its discretion.

Finally, defendant argues that the condition of the record prevents him from appealing issues related to having an unbiased and representative jury. Defendant states that it is not possible to determine the basis of his objection to the jury selection procedure and the grounds for the court's ruling. However, it is a relatively straightforward task to reconstruct the basis of defendant's objection from the available transcript, and the ruling of the court is certain. For instance, defendant states that the record is incomplete concerning the court's inquiry into the contact between a juror and one of the State's witnesses. However, a review of the transcript shows that the only inaudible portion occurs after the court completed its questioning of the jury, made its ruling, and moved on to addressing the issue of sufficient leg room for another juror. Defendant also argues that the transcript impairs his ability to raise appeal issues relating to juror prejudice and dismissal of a juror for reasons of personal hardship. Again, our review of the transcript indicates that these matters are sufficiently preserved so that the court's actions can be readily understood.

In short, the transcript is incomplete in places, most frequently in bench conferences. As a result, reading those portions of the transcript is comparatively burdensome. Nevertheless, in most instances it is possible to reconstruct the substance of what was said, even if the precise words are lost. Where argument of counsel or the court's reason for a holding are lost, the fact of the objection and the subsequent ruling are evident. As stated by our Supreme Court in *State v. McLaughlin*, 323 N.C. 68, 372 S.E.2d 49 (1988), *judgment vacated and remanded on other grounds*, 494 U.S. 1021, 108 L. Ed. 2d 601

(1990), "[a]lthough the transcript in the case *sub judice* cannot be described as a model of reporting service, it is not so inaccurate as to prevent this Court from reviewing it for errors in defendant's trial." *Id.* at 108, 372 S.E.2d at 75 (dismissing defendant's argument that the condition of the transcript of his capital trial and the length of time it took the court reporter to prepare the transcript precluded meaningful appellate review). Similarly, in the case at bar, the transcript, despite its imperfections, is not so inaccurate as to prevent meaningful review by this Court. Any inaccuracies or omissions do not rise to the level found by the Supreme Court in *State v. Sanders*, 312 N.C. 318, 320, 321 S.E.2d 836, 837 (1984) (granting new trial where meaningful appellate review was precluded by "the entirely inaccurate and inadequate transcription of the trial proceedings and [where] no adequate record [could] be formulated").

Because the transcript was adequate to allow defendant to raise the appellate issues discussed above, those issues are deemed abandoned. N.C. R. App. P. 28(b)(5). Defendant's assignment of error relating to the condition and quality of the transcript is overruled.

## III.

[4] Defendant next contends that the trial court violated his rights to a fair trial, due process and other rights secured by the Fifth, Sixth and Fourteenth Amendments of the United States Constitution by allowing his wife to testify on cross-examination to confidential marital communications. We will examine each of the challenged communications below. However, we note as a preliminary matter that defendant failed to make timely objection to the first and second statements at trial as required by N.C. R. App. P. 10(b)(2). Accordingly, these statements are reviewed for plain error. *See State v. Rush*, 340 N.C. 174, 180, 456 S.E.2d 819, 823 (1995) (reviewing defendant's assignment of error under the plain error rule where defendant failed to object to the admission of marital communications made by his spouse at trial). Our Supreme Court has defined "plain error" as "an error so prejudicial that it amounts to a denial of a fair trial to the defendant." *State v. Hasty*, 133 N.C. App. 563, 565, 516 S.E.2d 428, 429, *disc. review denied,* 350 N.C. 842, 539 S.E.2d 302 (1999) (citation omitted). "In order to prevail under plain error analysis, defendant must first establish that the trial court committed error and then show that 'absent the error, the jury probably would have reached a different result.' " *Rush*, 340 N.C. at 180, 456 S.E.2d at 823 (quoting *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993)).

**STATE v. HAMMONDS**

[141 N.C. App. 152 (2000)]

The statute controlling our analysis of this issue is section 8-57 of the North Carolina General Statutes, entitled Husband and Wife as Witnesses in Criminal Actions, which states:

(a) The spouse of the defendant shall be a competent witness for the defendant in all criminal actions, but the failure of the defendant to call such spouse as a witness shall not be used against him. Such spouse is subject to cross-examination as are other witnesses.

(b) The spouse of the defendant shall be competent but not compellable to testify for the State against the defendant in any criminal action or grand jury proceedings, except that the spouse of the defendant shall be both competent and compellable to so testify:

(1) In a prosecution for bigamy or criminal cohabitation, to prove the fact of marriage and facts tending to show the absence of divorce or annulment;

(2) In a prosecution for assaulting or communicating a threat to the other spouse;

(3) In a prosecution for trespass in or upon the separate lands or residence of the other spouse when living separate and apart from each other by mutual consent or court order;

(4) In a prosecution for abandonment of or failure to provide support for the other spouse or their child;

(5) In a prosecution of one spouse for any other criminal offense against the minor child of either spouse, including any illegitimate or adopted or foster child of either spouse.

(c) No husband or wife shall be compellable in any event to disclose any confidential communication made by one to the other during their marriage.

N.C. Gen. Stat. § 8-57 (1999). While recognizing that the cases and statutes pertinent to this issue "have not been models of clarity," *State v. Holmes*, 330 N.C. 826, 833, 412 S.E.2d 660, 664 (1992), our Supreme Court has interpreted section 8-57 to mean that a "spouses shall be incompetent to testify against one another in a criminal proceeding *only if the substance of the testimony concerns a* 'confidential communication' between the marriage partners made during the

duration of their marriage," *State v. Freeman*, 302 N.C. 591, 596, 276 S.E.2d 450, 453 (1981). This interpretation:

> allows marriage partners to speak freely to each other in confidence without fear of being thereafter confronted with the confession in litigation. However, by confining the spousal disqualification to testimony involving "confidential communications" with the marriage, we prohibit the accused spouse from employing the common law rule solely to inhibit the administration of justice.

*Id.* at 596, 276 S.E.2d at 453-54 (citation omitted). "To fall within the purview of this privilege, the communication must have been made confidentially between wife and husband during the marriage." *State v. Holmes*, 101 N.C. App. 229, 235, 398 S.E.2d 873, 876 (1990), *aff'd*, 330 N.C. 826, 412 S.E.2d 660 (1992) (citation omitted). Accordingly, the determination of whether a communication is "confidential" within the meaning of the statute depends on whether the communication "was induced by the marital relationship and prompted by the affection, confidence, and loyalty engendered by such relationship." *Freeman*, 302 N.C. at 598, 276 S.E.2d at 454 (citations omitted). With these rules in mind, we now turn to the facts of the case at bar.

### A. Statement That Cable Workers Were Outside

During trial, the State called defendant's wife as a prosecution witness during its case in chief. She was competent to testify, because the privilege of choosing whether or not to testify belonged to her and not to defendant. *See* N.C. Gen. Stat. § 8-57(b); *Holmes*, 330 N.C. at 834-35, 412 S.E.2d at 665; *State v. McQueen*, 324 N.C. 118, 137, 377 S.E.2d 38, 49 (1989); *State v. Britt*, 320 N.C. 705, 709 n.1, 360 S.E.2d 660, 662 n.1 (1987). However, when defendant objected to her testimony regarding confidential communications arising out of the marriage and asserted his privilege under N.C. Gen. Stat. § 8-57(c), the trial court held a *voir dire* examination, sustained defendant's objection, and limited Mrs. Hammonds' testimony.

Defendant thereafter called his wife as a witness on his behalf. When cross-examined by the State, Mrs. Hammonds testified:

Q: On the morning that Mr. Graham was killed, you were in the bedroom, were you not?

A: Yes, sir.

Q: You saw the Defendant—or you saw the victim?

A: The victim, no, I never did.

Q: And did you look out the window and see the cable people?

A: Yes sir, I saw the truck outside.

Q: And did you tell your husband it was the cable people?

A: Yes, sir.

Although Mrs. Hammonds was subject to cross-examination like any other witness pursuant to N.C. Gen. Stat. § 8-57(a), "this right of cross-examination [does] not encompass the right to compel the testifying spouse to disclose a confidential marital communication." *Holmes*, 330 N.C. at 832, 412 S.E.2d at 663. Nonetheless, the statement was not induced by the confidence of the marital relationship. Instead, the statement was at most a casual observation not "induced by the marital relationship and prompted by the affection, confidence, and loyalty engendered by such relationship." *Freeman*, 302 N.C. at 598, 276 S.E.2d at 454 (citations omitted). Accordingly, we hold that this statement was properly admitted.

### B. Defendant's Act of Retrieving a Gun

Mrs. Hammonds also testified on cross-examination:

Q: Did you see him when he came back in the bedroom and got the gun out from under the bed?

A: Yes, I seen him when he came back in the bedroom.

Although we have already noted the ambiguity of this testimony, *see* footnote 1, for purposes of this appeal, we will resolve the ambiguity in favor of defendant and assume that Mrs. Hammonds meant that she did observe the defendant remove a firearm from under the bed.

"An action may be protected if it is intended to be a communication and is the type of act induced by the marital relationship." *Holmes*, 330 N.C. at 835, 412 S.E.2d at 665; *see also State v. Suits*, 296 N.C. 553, 557, 251 S.E.2d 607, 609 (1979) (noting that "[a]n act, such as a gesture, can be a declaration within the meaning of this rule"). In *Holmes*, Debra Penn, the defendant's wife, testified for the State that she was at home when the defendant arrived with Holmes and Hooper. After several minutes, the defendant instructed Holmes and Hooper to go outside because he wanted to talk with his wife. When the defendant and his wife were alone, he took a gun out of the

STATE v. HAMMONDS

[141 N.C. App. 152 (2000)]

kitchen cabinet and told his wife that he was going to kill Hooper. Debra Penn also testified that the defendant trusted her. The Supreme Court concluded that the defendant's action was a confidential marital communication.

By contrast, defendant's communication in retrieving the gun here was not induced by, or even part of, the marital relationship. Although Mrs. Hammonds stated that she watched over defendant when he had nightmares, she also testified that she was afraid of him and had previously seen him take guns out to confront other people on the road. Defendant took no steps to ensure confidentiality while obtaining the weapon. In short, the record shows that defendant sought to arm himself, and the weapon he wanted was under the bed; his wife's presence in the bedroom to watch was incidental. Accordingly, the admission of this testimony was not plain error.

### 3. Mrs. Hammonds' Statement That Defendant Told Her What Happened on 24 July 1992

Finally, Mrs. Hammonds testified on cross-examination:

Q: When the Defendant came back in from killing Mr. Graham, did he tell you what he'd done?

. . . .

THE COURT: The objection is overruled. You may reask the question. Ma'am, you may answer yes or no.

Q: Ma'am, did the Defendant tell you what he had done?

[DEFENSE COUNSEL]: Object.

THE COURT: Overruled. You may answer yes or no.

A: Yes, sir.

[PROSECUTOR]: Nothing further.

This testimony cannot be considered the disclosure of a confidential marital communication, because Mrs. Hammonds did not reveal the content of any communication between herself and defendant. However, even if the mere fact that a communication between husband and wife took place were itself confidential, an issue we do not address, a review of the complete record reveals that the trial court ruled correctly. Defendant called his brother as a witness to testify that immediately after the shooting, defendant telephoned and told his brother that he thought he had killed someone. Although the trial

**STATE v. HAMMONDS**

[141 N.C. App. 152 (2000)]

court sustained the State's hearsay objection, defendant was allowed to put his brother's testimony in the record. This proffered testimony demonstrates that defendant did not treat his statement to his wife as a confidential matter. Accordingly, defendant's assignments of error relating to the marital privilege are overruled.

IV.

[5] Finally, defendant contends that the indictment in his case is fatally deficient because it alleges neither premeditation and deliberation nor felony murder. Defendant claims that the indictment as drafted violates his rights to due process, a jury verdict, and notice.

Defendant did not raise an objection to his indictment at trial. As our Supreme Court recently noted:

> It is well settled that "a constitutional question which is not raised and passed upon in the trial court will not ordinarily be considered on appeal." An attack on an indictment is waived when its validity is not challenged in the trial court. However, where an indictment is alleged to be invalid on its face, thereby depriving the trial court of its jurisdiction, a challenge to that indictment may be made at any time, even if it was not contested in the trial court.

*State v. Wallace,* 351 N.C. 481, 503, 528 S.E.2d 326, 340-41, *cert. denied,* —— U.S. ——, 148 L. Ed. 2d 498 (2000) (internal citations omitted). Because defendant argues in his appellate brief that "the trial court lacked jurisdiction to proceed on an unconstitutional murder indictment that failed to specify all elements of the crime charged," this issue is properly before the Court.

Section 15-144 of the North Carolina General Statutes, listing the necessary elements for a valid short-form murder indictment, provides:

> In indictments for murder and manslaughter, it is not necessary to allege matter not required to be proved on the trial; but in the body of the indictment, after naming the person accused, and the county of his residence, the date of the offense, the averment "with force and arms," and the county of the alleged commission of the offense, as is now usual, it is sufficient in describing murder to allege that the accused person feloniously, willfully, and of his malice aforethought, did kill and murder (naming the person killed), and concluding as is now required by law . . . and any bill

of indictment containing the averments and allegations herein named shall be good and sufficient in law as an indictment for murder or manslaughter, as the case may be.

N.C. Gen. Stat. § 15-144 (1999). Our Supreme Court has repeatedly held that "indictments based on this statute are in compliance with both the North Carolina and United States Constitutions." *Wallace*, 351 N.C. at 504-05, 528 S.E.2d at 341; *see also State v. Braxton*, 352 N.C. 158, 531 S.E.2d 428 (2000) (concluding that absence of allegations of premeditation and deliberation or felony murder did not render short-form indictment for murder defective); *State v. Harris*, 323 N.C. 112, 371 S.E.2d 689 (1988) (same); *State v. Melton*, 307 N.C. 370, 298 S.E.2d 673 (1983) (noting that a bill of indictment complying with N.C. Gen. Stat. § 15-144 supports a conviction of first-degree murder); *State v. Williams*, 304 N.C. 394, 284 S.E.2d 437 (1981) (finding that an indictment for murder in accordance with N.C. Gen. Stat. § 15-144 is sufficient to sustain a guilty verdict of murder and meets the requirements of due process of both the United States and North Carolina Constitutions); *State v. Norwood*, 303 N.C. 473, 279 S.E.2d 550 (1981) (holding that an indictment tracking the language of N.C. Gen. Stat. § 15-144 for murder allows the State to prove both premeditation and deliberation or felony murder). Therefore, it is "sufficient to charge first degree murder without specifically alleging premeditation and deliberation or felony murder." *State v. Avery*, 315 N.C. 1, 14, 337 S.E.2d 786, 793 (1985), *appeal dismissed*, 326 N.C. 51, 389 S.E.2d 96 (1990).

The indictment in the present case stated:

The jurors for the State upon their oath present that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully and feloniously and of malice aforethought did kill and murder Allen H. Graham.

This language satisfies the requirements of N.C. Gen. Stat. § 15A-144. Accordingly, this assignment of error is overruled.

Defendant received a fair trial free of prejudicial error.

No error.

Judge SMITH concurs.

Judge GREENE dissents.

Judge GREENE dissenting.

A speedy trial, for persons accused of committing crimes, serves to protect not only the accused, but also certain societal interests. *Barker v. Wingo*, 407 U.S. 514, 519, 33 L. Ed. 2d 101, 110-11 (1972). The harm to society includes: (1) the detrimental effects on rehabilitation caused by a "delay between arrest and punishment"; (2) the cost of "lengthy pretrial detention"; (3) the loss of "wages which might have been earned" by the "incarcerated breadwinners"; (4) the opportunity of persons, released on bond for lengthy periods awaiting trial, to commit other crimes; and (5) the possibility, because of a large backlog of criminal cases, for defendants "to negotiate more effectively for pleas of guilty to lesser offenses and otherwise manipulate the system." *Id.* at 519-21, 33 L. Ed. 2d at 111. The harm to the accused includes: (1) "oppressive pretrial incarceration;" (2) "anxiety and concern of the accused;" and (3) "the possibility that the [accused's] defense will be impaired by" dimming memories and loss of exculpatory evidence. *Id.* at 532, 33 L. Ed. 2d at 118. Of these harms to the accused, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire [criminal] system." *Id.*

In evaluating whether a particular accused has been deprived of his constitutional right to a speedy trial, our courts have identified "some of the factors which . . . should [be] asses[ed]." *Id.* at 530, 33 L. Ed. 2d at 117. Those factors include whether: "delay before trial was uncommonly long, . . . the government or criminal defendant is more to blame for that delay, . . . in due course, the defendant asserted his right to a speedy trial, and . . . [the defendant] suffered prejudice as the delay's result." *Doggett v. United States*, 505 U.S. 647, 651, 120 L. Ed. 2d 520, 528 (1992). None of these factors are "a necessary or sufficient condition to the finding of a deprivation of the right of a speedy trial." *Barker*, 407 U.S. at 533, 33 L. Ed. 2d at 118. "Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Id.*

The length of the delay is actually a two-part inquiry. *Doggett*, 505 U.S. at 651, 120 L. Ed. 2d at 528. First, the court must determine if the delay between the accusation and the trial is unreasonable. As a general proposition, a post-accusation delay is unreasonable if it "approaches one year." *Id.* at 652 n.1, 120 L. Ed. 2d at 528 n.1. If the delay is not unreasonable, there has been no violation of the accused's speedy trial rights and, thus, no need to consider the other factors. If the post-accusation is unreasonable, the delay is "pre-

sumptively prejudicial" and the longer the delay, the more "intensi-
fied" the presumption of prejudice. *Id.* at 652, 120 L. Ed. 2d at 528.

There may be valid or acceptable reasons for the unreasonable
delay, *i.e.*, difficulty in locating a missing witness. The reasons may
be invalid or unacceptable, *i.e.*, prosecutorial bad faith (intentionally
delaying the prosecution to gain some impermissible advantage over
defendant at trial), prosecutorial negligence or overcrowded courts.
*Barker*, 407 U.S. at 531, 33 L. Ed. 2d at 117. Prosecutorial bad faith,
resulting in an unreasonable delay in prosecution, raises an inference
of prejudice per se. *See Doggett*, 505 U.S. at 656, 120 L. Ed. 2d at 531.
Although prosecutorial negligence is generally "to be weighed more
lightly than a deliberate intent to harm the accused's defense," an
excessive delay based on prosecutorial negligence necessarily "com-
promises the reliability of the trial in ways that neither party can
prove or, for that matter, identify," *id.* at 655, 120 L. Ed. 2d at 531, and,
thus, warrants granting a defendant relief, without a showing of par-
ticularized prejudice, unless the State can affirmatively show the
delay left a defendant's ability to defend himself unimpaired, *id.* at
657-58, 120 L. Ed. 2d. at 532; *see State v. Chaplin*, 122 N.C. App. 659,
663, 471 S.E.2d 653, 655 (1996) (lengthy delay establishes *prima facie*
case that delay was caused by neglect of the State and the State is
required to offer evidence explaining delay).

In this case, there was a delay, between defendant's arrest and
his trial, of four and one half years. He remained in jail, without the
benefit of bond, during that entire time. This delay is not only un-
reasonable, but excessive and thus presumptively compromised the
reliability and fairness of defendant's trial.[3] Because the State has
neither justified the delay, nor shown the delay has not impaired the
defendant's ability to defend himself, defendant has been denied his
constitutional right to a speedy trial and is entitled to a reversal of his
conviction.[4] Although there is no showing the prosecutor intention-

---

3. Even if defendant were required to show prejudice, which I do not believe is
necessary in this case, he has done so.

Defendant was incarcerated for approximately four and one half years and held
in jail without the benefit of bond. During this time, the State's principal investigator
died and the principal investigator's notes were unable to be located by the State.
Without the principal investigator, or his notes, defendant was prevented from discov-
ering and presenting potentially exculpatory material at his trial. Moreover, as the
majority points out, during the long delay, two witnesses changed their version of
events.

4. Defendant's delay in asserting his speedy trial right, some four years into the
process, weighs against him but does not foreclose his current claim. *State v. Flowers*,

ally delayed the trial for the purpose of obtaining an advantage over defendant, the record clearly shows the prosecutor did not make a reasonable effort to avoid the excessive delay of defendant's trial and thus was negligent. Indeed, the record reveals there were charges filed against other individuals, after defendant's arrest, and those cases were tried prior to the date of defendant's trial. Furthermore, there were forty-eight violent felonies filed in Robeson County Superior Court after defendant's case was filed, all of which were disposed of prior to defendant's case. These forty-eight felonies were disposed of, on average, within 502 days, as compared to defendant's case that was disposed of in 1,498 days.

In summary, the prosecutor of Robeson County[5] egregiously persisted in failing to prosecute defendant and, therefore, defendant is entitled to have his conviction reversed. To hold otherwise would permit the State to abuse the interests of criminal defendants assigned low prosecutorial priority.

---

347 N.C. 1, 28, 489 S.E.2d 391, 407 (1997), *cert. denied,* 522 U.S. 1135, 140 L. Ed. 2d 150 (1998). This delay in asserting his right must be balanced against the other factors in this case. The lengthy delay, the negligence of the State in causing the delay, and the un-rebutted presumption of prejudice to defendant far outweigh defendant's failure to earlier assert his speedy trial right. *See Chaplin,* 122 N.C. App. at 666, 471 S.E.2d at 657.

5. I note that at the time of defendant's arrest, J. Richard Townsend was the prosecutor of Robeson County and in 1994, L. Johnson Britt, III became the prosecutor of Robeson County.