STATE OF NORTH CAROLINA v. HENRY BERNARD SPIVEY, JR.

No. 299A02

(Filed May 2 2003)

**Constitutional Law— speedy trial—*Barker* factors balanced— no violation**

A first-degree murder defendant's right to a speedy trial was not violated by a delay of four and one-half years after his arrest when the *Barker v. Wingo* factors were balanced. The delay is long enough to trigger examination of the other factors; the delay was caused by neutral factors, including the number of pending first-degree murder cases; defendant failed to carry his burden of showing neglect or willfulness the State; defendant's assertion of the right to a speedy trial does not alone entitle him to relief, even assuming that his pro se speedy trial request while he was represented by counsel was proper; and defendant did not show that his defense was impaired by the delay. He ultimately pled guilty to second-degree murder rather than risk rejection of his self-defense contention and face the death penalty.

Justice BRADY dissenting.

Justice ORR joins in this dissenting opinion.

**STATE v. SPIVEY**

[357 N.C. 114 (2003)]

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 150 N.C. App. 189, 563 S.E.2d 12 (2002), affirming an order denying defendant's motion to dismiss for lack of a speedy trial entered in open court on 26 April 1999 and reduced to writing on 24 June 1999 entered by Judge Jack A. Thompson and a final judgment entered 3 May 1999 by Judge James R. Vosburgh in Superior Court, Robeson County. Heard in the Supreme Court 11 March 2003.

*Roy Cooper, Attorney General, by Robert C. Montgomery, Assistant Attorney General, for the State.*

*William L. Davis, III, for defendant-appellant.*

*American Civil Liberties Union of North Carolina Legal Foundation, Inc., by Seth H. Jaffe, amicus curiae.*

WAINWRIGHT, Justice.

On 18 October 1994, Henry Bernard Spivey, Jr. (defendant), was arrested for the murder of Jermaine Morris. The record reveals that on 17 October 1994, the previous day, officers were dispatched to a housing project in Lumberton, North Carolina, where they found Morris dead from numerous gunshot wounds. An autopsy showed Morris had been shot eleven times, mostly in the chest and stomach. It appears that defendant turned himself in and told authorities that he shot Morris.

On the day of the murder, defendant and Morris had a conflict over a woman named Samantha Fields, and defendant began shooting Morris when Morris struck him. Nathaniel Spivey, defendant's thirteen-year-old brother, also joined in shooting Morris. Nathaniel was charged as a juvenile but was bound over to superior court for trial as an adult. He pled guilty to second-degree murder and received a minimum sentence of 135 months' to a maximum sentence of 171 months' imprisonment.

On 27 November 1995, while represented by counsel, defendant filed a handwritten, *pro se* "Motion Reque[s]ting a Prompt and Speedy Trial." In his *pro se* motion, defendant stated: "[t]hat as of this date and on, defendant objects to any and all (including those acquiescued [sic] to by the Court Appointed Counsel) continuance's [sic]." Nearly twenty-one months later, on 8 August 1997, defendant's court-appointed attorneys filed a motion to dismiss for lack of a speedy trial.

STATE v. SPIVEY

[357 N.C. 114 (2003)]

Defendant's motion to dismiss for lack of a speedy trial was initially heard before the Honorable Gregory Weeks on 29 April 1998. The trial court heard arguments from counsel and then instructed the parties that it needed further briefs and documentation from the court records and continued the hearing to a later date.

A second hearing was held on defendant's motion to dismiss for lack of a speedy trial before the Honorable Jack Thompson on 26 April 1999. At this hearing, the State stipulated that defendant had been in jail since 18 October 1994 (approximately four and one-half years). The State further stipulated to statements made by two potential witnesses. The State informed the trial court that one of the witnesses, Fred Smith, was incarcerated in the Department of Correction. The State informed the trial court that the other witness, Samantha Fields, had changed addresses two or three times but that the State was in the process of trying to find her. In addition, pursuant to Judge Weeks' order, the State presented to the court documentation of murder cases tried between defendant's indictment and 19 April 1999. The State then provided defendant with a copy of this list and copies of the judgments. Following the hearings before the Honorable Gregory Weeks and the Honorable Jack Thompson, Judge Thompson announced in open court on 26 April 1999 that he was denying defendant's motion to dismiss for lack of a speedy trial on the grounds that there was not a sufficient showing by the defendant that his rights to a speedy trial were denied. Judge Thompson's decision is later reflected in a written order filed on 24 June 1999.

Defendant's case was subsequently called for trial on 3 May 1999. Defendant tendered a plea of guilty to second-degree murder. During a plea colloquy with the trial court, defendant acknowledged understanding that, by pleading guilty, he was giving up his constitutional rights relating to trial by jury. The plea was pursuant to a plea arrangement providing that defendant would be sentenced to a prison term of a minimum of 135 months' to a maximum of 171 months' imprisonment and that defendant was "reserv[ing] the right to appeal the denial of his motion to dismiss for lack of a speedy trial."

On 6 May 1999, defendant filed notice of appeal to the Court of Appeals. In an opinion filed 7 May 2002, the Court of Appeals granted certiorari to review the trial court's denial of defendant's motion to dismiss for lack of a speedy trial. *State v. Spivey*, 150 N.C. App. 189, 189-90, 563 S.E.2d 12, 12 (2002). Upon review, the majority in the Court of Appeals concluded that *State v. Hammonds*, 141 N.C. App.

152, 541 S.E.2d 166 (2000), *aff'd per curiam*, 354 N.C. 353, 554 S.E.2d 645 (2001), *cert. denied*, 536 U.S. 907, 153 L. Ed. 2d 184 (2002) was controlling. *Spivey*, 150 N.C. App. at 190, 563 S.E.2d at 12. *Hammonds* and the present case originated in Robeson County. *Id.* at 191, 563 S.E.2d at 13. The Court of Appeals noted that "[i]n *Hammonds*, the defendant argued that the trial court erred by denying his motion to dismiss where there was a pretrial delay of four and one-half years." *Id.* at 190, 563 S.E.2d at 12. In the present case, the Court of Appeals further quoted the following language from *Hammonds*:

> "Defendant argues that the delay between his arrest and trial was caused in part by the State's 'laggard performance.' The record, however, reveals that the local docket was congested with capital cases. The trial court described it as 'chopped the block [sic] with capital cases. They're trying two at a time and just one right after the other, and there are only so many that can be tried.' 'Our courts have consistently recognized congestion of criminal court dockets as a valid justification for delay.' *State v. Hughes*, 54 N.C. App. 117, 119, 282 S.E.2d 504, 506 (1981) (citations omitted) (finding defendant failed to meet his burden where delay was result of backlog of cases). Indeed, '[b]oth crowded dockets and lack of judges or lawyers, and other factors, make some delays inevitable.' *State v. Brown*, 282 N.C. 117, 124, 191 S.E.2d 659, 664 (1972) (citation omitted). Accordingly, in assessing defendant's speedy trial claim, we see no indication that court resources were either negligently or purposefully underutilized."

*Spivey*, 150 N.C. App. at 190, 563 S.E.2d at 12-13 (quoting *Hammonds*, 141 N.C. App. at 160-61, 541 S.E.2d at 173) (alterations in original).

The Court of Appeals held that "[t]he State in this case made a showing[,] as it did in *Hammonds*, that the dockets were clogged with murder cases and this caused an unavoidable backlog of cases." *Id.* at 191, 563 S.E.2d at 13. The dissenting judge concluded that the trial court abused its discretion in denying defendant's motion to dismiss for lack of a speedy trial. *Id.* (Timmons-Goodson, J., dissenting). For the reasons discussed herein, we affirm the majority decision of the Court of Appeals.

The sole issue in this case is whether the Court of Appeals correctly affirmed the trial court's denial of defendant's motion to dis-

miss for lack of a speedy trial. Defendant argues that, because over four and one-half years elapsed between his arrest and trial, he was denied his constitutional right to a speedy trial.

This Court has stated:

> The right to a speedy trial is different from other constitutional rights in that, among other things, deprivation of a speedy trial does not *per se* prejudice the ability of the accused to defend himself; it is impossible to determine precisely when the right has been denied; it cannot be said precisely how long a delay is too long; there is no fixed point when the accused is put to a choice of either exercising or waiving his right to a speedy trial; and dismissal of the charges is the only possible remedy for denial of the right to a speedy trial.

*State v. McKoy*, 294 N.C. 134, 140, 240 S.E.2d 383, 388 (1978).

In *Barker v. Wingo*, the United States Supreme Court identified four factors that "courts should assess in determining whether a particular defendant has been deprived of his right" to a speedy trial under the federal Constitution. 407 U.S. 514, 530, 33 L. Ed. 2d 101, 117 (1972). These factors are: (i) the length of delay, (ii) the reason for delay, (iii) the defendant's assertion of his right to a speedy trial, and (iv) whether the defendant suffered prejudice as a result of the delay. *Id.*; *see also State v. Flowers*, 347 N.C. 1, 27, 489 S.E.2d 391, 406 (1997), *cert. denied*, 522 U.S. 1135, 140 L. Ed. 2d 150 (1998). "We follow the same analysis when reviewing such claims under Article I, Section 18 of the North Carolina Constitution." *State v. Grooms*, 353 N.C. 50, 62, 540 S.E.2d 713, 721 (2000), *cert. denied*, 534 U.S. 838, 151 L. Ed. 2d 54 (2001).

This Court must consider the factors in light of the balancing test set out by the United States Supreme Court as follows:

> We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process. But, because we are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the constitution.

*Barker*, 407 U.S. at 533, 33 L. Ed. 2d at 118-19. With these principles in mind, we now balance the four factors based on the evidence in this case.

First, the length of the delay is not *per se* determinative of whether defendant has been deprived of his right to a speedy trial. *See State v. Webster*, 337 N.C. 674, 678, 447 S.E.2d 349, 351 (1994). The United States Supreme Court has noted that "lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year." *Doggett v. United States*, 505 U.S. 647, 652 n.1, 120 L. Ed. 2d 520, 528 n.1 (1992). However, " 'presumptive prejudice' does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* inquiry." *Id.* In this case, the length of delay was approximately four and one-half years, which is clearly enough to trigger examination of the other factors.

Second, defendant has the burden of showing that the delay was caused by the *neglect* or *willfulness* of the prosecution. *See Webster*, 337 N.C. at 679, 447 S.E.2d at 351. Only after the defendant has carried his burden of proof by offering *prima facie* evidence showing that the delay was caused by the neglect or willfulness of the prosecution must the State offer evidence fully explaining the reasons for the delay and sufficient to rebut the *prima facie* evidence. *McKoy*, 294 N.C. at 143, 240 S.E.2d at 390. This Court has stated:

> The constitutional guarantee does not outlaw good-faith delays which are reasonably necessary for the State to prepare and present its case. . . . Neither a defendant nor the State can be protected from prejudice which is an incident of ordinary or reasonably necessary delay. The proscription is against purposeful or oppressive delays and those which the prosecution could have avoided by reasonable effort.

*State v. Johnson*, 275 N.C. 264, 273, 167 S.E.2d 274, 280 (1969) (citations omitted).

In the present case, the record does not reveal that the delay resulted from willful misconduct by the State. To the contrary, the record shows numerous causes for the delay. This case, like *Hammonds*, originated in Robeson County during a substantially similar time frame. The State made a showing in this case, as it did in *Hammonds*, that the dockets were clogged with murder cases. In

fact, *Hammonds* was one of the cases tried in Robeson County during defendant's pretrial incarceration.

The State, in explaining the delay in the present case, made the following showing: Seventy-three first-degree murder cases were pending in Robeson County when defendant was indicted. These seventy-three first-degree murder cases were also pending when the district attorney took office on 1 November 1994. Of these seventy-three first-degree murder cases, only five, including defendant's case, had not been disposed of by 29 April 1998. Four of these five remaining cases predate defendant's case. The district attorney has dealt with the cases in chronological order, beginning with the oldest. Defendant's case was tried based on this policy. In 1995, the double homicide trial of defendant John Clark, Jr. was held, and the sentencing phase of that trial lasted for thirteen to seventeen weeks. During the pendency of defendant's case, numerous capital murder trials were held in Robeson County including the trial of Daniel Andre Greene, who was the defendant in the highly publicized capital murder case involving the death of Michael Jordan's father, and which case was designated "exceptional." During one point in defendant's pretrial incarceration, there were only two courtrooms available in Robeson County because of courthouse renovation, and the Clark and Greene cases were held in these courtrooms. Greene's trial began in November 1995, and the sentencing proceeding in that case concluded approximately nine weeks into 1996. In 1996, the Robeson County district attorney's office tried fifteen first-degree murder cases, thirteen of which were tried capitally and all fifteen of which went to juries for a verdict. In 1997, the district attorney's office prosecuted twelve first-degree murder cases, and all twelve went to juries for a verdict. In 1997, the district attorney's office tried sixty-seven felony jury trials and twenty-three or twenty-four misdemeanor jury trials. From 1 July 1997 through 31 March 1998, a total of twenty-nine homicide cases were disposed of by the district attorney's office. Defendant's counsel was involved during the pendency of defendant's case in a number of murder cases that predated defendant's. Ninety-three murder cases in Robeson County were disposed of while defendant's case was pending. Accordingly, the delay in the present case is not particularly a matter of court congestion. The delay resulted from a combination of the circumstances cited above. *See Brown*, 282 N.C. at 124, 191 S.E.2d at 664 (holding that "crowded dockets and lack of judges or lawyers, and other factors, make some delays inevitable").

This Court has also recognized "that there may be selectivity in prosecutions and that the exercise of this prosecutorial prerogative does not reach constitutional proportion unless there be a showing that the selection was deliberately based upon 'an unjustifiable standard such as race, religion, or other arbitrary classification.' " *State v. Cherry*, 298 N.C. 86, 103, 257 S.E.2d 551, 562 (1979) (quoting *Oyler v. Boles*, 368 U.S. 448, 456, 7 L. Ed. 2d 446, 453 (1962)), *cert. denied*, 446 U.S. 941, 64 L. Ed. 2d 796 (1980). In the present case, defendant has failed to show that the State, by trying some murder cases that may have postdated defendant's, made these selections based on some unjustifiable standard. The complexities of a capital trial versus the disposal of noncapital trials and pleas justify the disposition of some noncapital cases before capital cases. Defendant has failed to present *any* evidence that the delay was caused by the State's neglect or willfulness, and we see no indication that court resources were either negligently or purposefully underutilized. Indeed, defendant relies solely on the length of delay and ignores the balancing of other factors. In light of these reasons, we conclude that the delay was caused by neutral factors and that defendant failed to carry his burden to show delay caused by the State's neglect or willfulness.

Third, defendant's *pro se* assertion of his right to a speedy trial is not determinative of whether he was denied the right. When defendant filed his *pro se* motion for a speedy trial on 27 November 1995, he was represented by counsel. Although defendant's *pro se* motion was filed more than a year after his arrest, his assertion of the right to a speedy trial was made in violation of the rule that a defendant does not have the right to be represented by counsel and to also appear *pro se. State v. Thomas*, 346 N.C. 135, 138, 484 S.E.2d 368, 370 (1997). Defendant's counsel filed a motion for a speedy trial on behalf of defendant on 8 August 1997, almost three years after defendant's arrest. This Court has recently held that "[h]aving elected for representation by appointed defense counsel, defendant cannot also file motions on his own behalf or attempt to represent himself." *Grooms*, 353 N.C. at 61, 540 S.E.2d at 721. Defendant does not have the right to appear both by himself and by counsel. *Id.; see also* N.C.G.S. § 1-11 (2001). Assuming *arguendo* that defendant properly asserted his rights through his *pro se* motion, this assertion of the right, by itself, did not entitle him to relief. *See Barker*, 407 U.S. at 533, 33 L. Ed. 2d at 118 (holding that none of the factors alone is sufficient to establish a violation and that all must be considered together).

STATE v. SPIVEY

[357 N.C. 114 (2003)]

Fourth, in considering whether a defendant has been prejudiced because of a delay, this Court has noted that a speedy trial serves " '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.' " *Webster*, 337 N.C. at 680-81, 447 S.E.2d at 352 (quoting *Barker*, 407 U.S. at 532, 33 L. Ed. 2d at 118).

A defendant must show actual, substantial prejudice. *State v. Goldman*, 311 N.C. 338, 346, 317 S.E.2d 361, 366 (1984) (holding that "in the absence of a showing of actual prejudice, . . . our courts should consider dismissal in cases of serious crimes with extreme caution"). Defendant has failed to show that he suffered significant prejudice as a result of the delay. Defendant contends that two material witnesses, Fred Smith and Samantha Fields, could not be located. These witnesses were either available or could have been located with diligent effort at the time the case was called for trial.

At the 26 April 1999 hearing, the State informed defendant that Fred Smith was incarcerated and available. As for Samantha Fields, it is apparent that the State had not been able to find her at the time of the 26 April 1999 hearing. However, a subpoena included in the appendix to defendant's brief shows that it was served on Fields on 30 April 1999. The record shows that, pursuant to the subpoena, Fields was interviewed by defendant and was present when defendant's case was called for trial on 3 May 1999. Therefore, defendant could have proceeded to trial and presented the witnesses if he had chosen to do so. It was the State that sought Smith and Fields as primary witnesses. Defendant has failed to show that his defense was impaired in any way by the delay.

When the case was called for trial on 3 May 1999, defendant tendered a plea of guilty to second-degree murder. After the trial court engaged in a plea colloquy with defendant and the State offered a factual basis, one of defendant's attorneys expressed disagreement with the factual basis, told the trial court that Samantha Fields was present, and explained that Fields was giving a version of the offense that *might* raise self-defense as an option for defendant. The attorney then explained why defendant had nevertheless decided to plead guilty to second-degree murder: "[T]here is the possibility, even with the contention there may be a viable self-defense, there is a chance that the jury may reject that. So, that's why we feel it's in our best interest to take the plea that has been offered." Defendant chose to plead guilty to second-degree murder rather than be tried before a jury that might find him guilty of first-degree murder,

an offense for which the State was seeking the death penalty. Defendant chose to avoid that possibility by pleading guilty to a lesser included offense.

After balancing the four factors set forth above, we hold that defendant's constitutional right to a speedy trial has not been violated. Accordingly, we affirm the decision of the Court of Appeals.

AFFIRMED.

Justice BRADY dissenting.

In this case, the record reveals that defendant was detained for 1,659 days from the time he was arrested, on 10 October 1994, until his case was disposed of, on 3 May 1999. Because I believe the four-and-one-half-year interval was attributable to either the State's inability or unwillingness to bring the case forward, I adamantly disagree with the majority's underlying conclusion that defendant "has failed to present *any* evidence that the delay was caused by the State's neglect or willfulness." I also take issue with the majority's assertion that there is "no indication that court resources were either negligently or purposefully underutilized" in this case. In fact, in my view, the evidence presented clearly, if not graphically, illustrates two things: (1) that there are long-term, systemic problems in the Robeson County courts when it comes to bringing serious criminal cases to trial; and (2) that the district attorney's office in Robeson County has contributed to the problem of crowded court dockets by failing to prosecute cases, including the one at issue, in a timely fashion. As a consequence, I respectfully dissent from the majority's holding that the rights accorded defendant under the speedy trial provisions of the United States Constitution and the North Carolina Constitution were not violated.

An individual's right to a speedy trial is among those rights enumerated in the Sixth Amendment to the United States Constitution which, in pertinent part, provides as follows: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. Const. amend VI. This guarantee was deemed to be "one of the most basic rights preserved by our Constitution," *Klopfer v. North Carolina*, 386 U.S. 213, 226, 18 L. Ed. 2d 1, 9 (1967), and was made applicable to the states, through the operation of the Due Process Clause of the Fourteenth Amendment, in the *Klopfer* case, *id.* at 222-26, 18 L. Ed. 2d at 7-9. In *Klopfer*, the Supreme Court recognized the historical significance of "speedy justice," noting that

Western society's reverence for the concept dated back to the Magna Carta of 1215. *Id.* at 223-24, 18 L. Ed. 2d at 8. At the birth of our nation, many of the original thirteen colonies also independently established speedy trial safeguards for their respective citizens. *See id.* at 225-26 n.21, 18 L. Ed. 2d at 9 n.21 (Delaware, Maryland, Massachusetts, Pennsylvania, and Virginia). Here in North Carolina, our state Constitution provides that "[a]ll courts shall be open[] [to] every person . . . without favor, denial, or *delay.*" N.C. Const. art. I, § 18 (emphasis added). The underlying guarantee was added to the state's Declaration of Rights amid the constitutional revisions of 1868. *See* N.C. Const. of 1868, art. I, § 35. Thus, in sum, the right to speedy justice has enjoyed a long and revered history, both in North Carolina and in our nation as a whole.

As for the underlying rationale supporting an accused's right to a speedy trial, the United States Supreme Court has held that the right is predicated on three objectives: (1) to prevent oppressive pretrial incarceration, (2) to lessen the anxiety and concern that accompanies the stigma of being charged with a criminal offense, and (3) to preclude a defendant's case from being impaired by the dimming memories of witnesses and/or the loss of exculpatory evidence. *Barker v. Wingo,* 407 U.S. 514, 532, 33 L. Ed. 2d 101, 118 (1972). In balance, the Court in *Barker* also held that the concerns for the accused must be measured against societal interests in a speedy trial, which the Court described thusly: (1) the detrimental effects on rehabilitation caused by delay between arrest and punishment, (2) the cost of lengthy pretrial detention, (3) the loss of wages that might have been earned by incarcerated breadwinners, (4) the opportunity of suspects released on bond to commit other crimes, and (5) the possibility that the accused may use a court backlog to negotiate favorable pleas to lesser offenses or to otherwise manipulate the system.[1] *Id.* at 519-21, 33 L. Ed. 2d at 110-12. In an even earlier case, the United States Supreme Court articulated the balancing of interests by describing the right to a speedy trial as "necessarily relative" because while it "secures rights to a defendant[,] [i]t does not preclude the rights of public justice." *Beavers v. Haubert,* 198 U.S. 77, 87, 49 L. Ed. 950, 954 (1905). Thus, in summary, when examining whether a right to a

---

1. In addition to those considerations mentioned by the United States Supreme Court, logic commands the recognition of a reciprocal interest for a defendant in preventing the State from manipulating a pretrial delay to its advantage. One obvious way the State could gain advantage through a pretrial delay would be to use the delay—and the implied threat to extend it—as a means to induce an incarcerated defendant to accept a plea that the State views as favorable.

speedy trial has been violated, a court must include an analysis of how the circumstances giving rise to the claim adversely affect the accused, the administration of justice, or both.

. As a means to determine whether an accused has been improperly denied prompt justice, the Court in *Barker* adopted a four-part balancing test originally proposed by Justice Brennan in his concurring opinion in *Dickey v. Florida*, 398 U.S. 30, 40, 26 L. Ed. 2d 26, 33 (1970) (Brennan, J., concurring). The four factors to consider are these: (1) the length of delay (between arrest and trial), (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) prejudice to the defendant resulting from the delay. *Barker*, 407 U.S. at 530-32, 33 L. Ed. 2d at 116-18. North Carolina has adopted the *Barker* test for speedy trial claims, whether they arise under the Sixth Amendment of the United States Constitution, or under Article I, Section 18 of our state Constitution. *See, e.g., State v. Flowers*, 347 N.C. 1, 489 S.E.2d 391 (1997), *cert. denied*, 522 U.S. 1135, 140 L. Ed. 2d 150 (1998); *State v. Hammonds*, 141 N.C. App. 152, 541 S.E.2d 166 (2000), *aff'd per curiam*, 354 N.C. 353, 554 S.E.2d 645 (2001), *and cert. denied*, 536 U.S. 907, 153 L. Ed. 2d 184 (2002).

Since the *Barker* decision in 1972, state and federal appellate courts across the nation have grappled with how to best weigh the four factors inherent to the speedy trial balancing test. One question that has proved especially troublesome is determining how long the delay must endure before the delay itself indicates prejudice. Here in North Carolina, the *Barker* test has been utilized in denying defendants relief under speedy trial claims, even where they were subjected to extended periods of pretrial incarceration. This attenuated approach to analyzing speedy trial claims is reflected not only by the majority in the instant case but in two other recent appellate decisions that have focused on whether the defendants demonstrated that the delay prejudiced their respective cases at trial. For example, in *Flowers*, this Court ultimately concluded that even if the delay did cause the defendant to lose access to a prospective witness, the defendant failed to show how that the witness' testimony would have altered the outcome of his trial. 347 N.C. at 29, 489 S.E.2d at 407. As a consequence, the Court held that the defendant was not denied his constitutional right to a speedy trial. *Id.* Similarly, in *Hammonds*, a case that also arose in Robeson County, the defendant's speedy trial contentions hinged upon whether or not *his case* was prejudiced by the death of an investigator and because two witnesses changed their stories during a delay of over four years. 141 N.C. App. at 163, 541

S.E.2d at 175. As for the question of whether the four-plus-year delay was *per se* prejudicial, the Court of Appeals concluded that the State's explanation for the delay—a crowded court docket—was adequate to overcome the defendant's allegations that the delay was a result of the prosecution's neglect or willfulness. *Id.* at 160, 541 S.E.2d at 173; *see also State v. Johnson,* 275 N.C. 264, 269, 167 S.E.2d 274, 278 (1969) (holding that burden is on the defendant to show that the delay was caused by the neglect or willfulness of the prosecution); *State v. Hughes,* 54 N.C. App. 117, 119, 282 S.E.2d 504, 506 (1981) (holding, in essence, that the defendant cannot show neglect or willfulness on the part of the prosecution when the delay is caused by a legitimate backlog of cases).

Thus, to this point, the aforementioned case law establishes that a four-plus-year delay from the time of arrest to the time of trial does not, in and of itself, prejudice either: (1) a defendant's three speedy trial interests (oppressive incarceration; anxiety, concern, and social stigma attached to accusation; and possibility of an impaired defense at trial); or (2) societal interests in the proper administration of justice (detrimental effects on rehabilitation caused by delay between arrest and punishment; the cost of lengthy pretrial detention; the possible loss of wages earned by incarcerated breadwinners; the opportunity of suspects released on bond to commit other crimes; and the possibility that the accused may use a court backlog to negotiate favorable pleas to lesser offenses or to otherwise manipulate the system).

It is against this backdrop that the instant defendant, who, like the defendant in *Hammonds* endured a four-plus year delay between his arrest and trial, argues that he was denied his constitutional right to a speedy trial. In sum, defendant contends that the facts and circumstances underlying his case distinguish it from that of the defendant in *Hammonds,* and as a consequence of those distinctions, defendant urges this Court to conclude that a proper application of the *Barker* test demonstrates prejudice. Support for defendant's argument can be found on two fronts: First, independent critical analysis of defendant's particular circumstances reveals that the State's explanation wholly fails to demonstrate that the elected district attorney was not negligent in contributing to the lengthy delay; second, such analysis also shows that the extended delay prejudiced both defendant's protected constitutional interests *and* society's interests in the administration of justice. As a result, I would conclude that defendant was improperly denied the right to a

speedy trial, as he is guaranteed under the Sixth Amendment to the United States Constitution and to the extent the right is similarly guaranteed by Section 18 of Article I of the North Carolina Constitution.

The State contends that the facts and circumstances here parallel those in *Hammonds* and urges this Court to use the *Hammonds* holding as a benchmark for the instant case. However, an objective examination of the two cases reveals that their apparent similarities boil down to just two factual circumstances: (1) each defendant was detained for four-plus years between arrest and trial; and (2) in each case, the State blamed a busy court docket for the delay. From that point, the two cases diverge, in good part because significantly more information about the state of the Robeson County courts was included in the record of the instant case. In *Hammonds*, the court held that the defendant did not allege that the prosecution willfully caused the delay; rather, the court determined that a crowded docket was the primary cause for the time lag between arrest and trial. 141 N.C. App. at 160-61, 541 S.E.2d at 173-74. Under such a scenario, the court ultimately concluded that because this Court has acknowledged that a prosecutor may exercise selectivity in preparing the trial calendar, *see State v. Cherry*, 298 N.C. 86, 103, 257 S.E.2d 551, 562 (1979), the prosecutor's scheduling decisions in *Hammonds* were not premised on unconstitutional considerations, such as race, religion, or other arbitrary classifications. *Hammonds*, 141 N.C. App. at 161, 541 S.E.2d at 174; *accord Cherry*, 298 N.C. at 103, 257 S.E.2d at 562. However, the same conclusion cannot be drawn on the facts at issue in the instant case. During oral argument, the State contended that ninety-one other homicide cases arose in the jurisdiction during the delay period in question and argued that such a crowded docket legitimately prevented prosecutors from bringing the case to trial before May of 1999. However, the State was prodded into conceding two other key points: (1) that as many as thirty-nine of those cases arose *after* defendant's arrest, yet *were disposed of prior to* the resolution of defendant's case; and (2) that only *one other defendant* among the ninety-two was detained longer than defendant. Thus, the district attorney's indifference toward defendant is evidence of precisely the type of neglect that reflects a violation of a defendant's right to a speedy trial. The State offered no explanation, beyond a crowded court docket, that would justify ignoring defendant's case—for over four and one-half years—while it actively prosecuted numerous newer cases.

Although I recognize that homicide cases cannot necessarily be tried in strict chronological sequence, I remain mindful that there are numerous checkpoints within the framework of our state's criminal procedure statutes that, if followed, help to ensure a timely prosecution of cases. One such statute carries particular significance in this case because it empowered the elected district attorney to calendar cases for trial. N.C.G.S. § 7A-49.3(a) (1986) (repealed 2000) ("[T]he district attorney shall file with the clerk of superior court a calendar of the cases he intends to call for trial at that session . . . ."). Thus, the district attorney was positioned to control the flow of the superior court's trial docket. As a consequence, the district attorney assumes the responsibility of tracking the criminal defendants awaiting trial within his or her district. While a crowded docket may partially explain a longer trial delay for *all* criminal defendants within a given district, it provides no justification for why the instant defendant was left warehoused in a local detention facility for four-plus years while thirty-nine other homicide detainees, who were arrested subsequent to defendant, had their cases disposed of before defendant.

I note, too, that when district attorneys find themselves in a bind over time constraints and crowded court dockets, they have the options of: (1) requesting the assignment of additional superior court judges, (2) requesting the assignment of one or more of the thirteen special superior court judges from the Administrative Office of the Courts (AOC), or (3) applying for the assignment of additional district attorneys, *see* N.C.G.S. § 7A-64(b) (1999) (amended 2000) (in subsection (b)(1), a judicial district may request such assistance when "[c]riminal cases have accumulated . . . beyond the capacity of the district attorney . . . to keep the dockets reasonably current"; in subsection (b)(2), a judicial district may request such assistance when "[t]he overwhelming public interest warrants the use of additional resources *for the speedy disposition* of cases . . . involving [offenses that are] a threat to public safety") (emphasis added)). Moreover, the General Assembly has specifically provided that district attorneys may request the assistance of the Attorney General's special prosecution division to prosecute or assist in the prosecution of criminal cases. N.C.G.S. § 114-11.6 (2001). The State offers no evidence that any of these various options were being pursued during the period of defendant's incarceration.

It is also apparent that the Robeson County district attorney, the appointed public defender, members of the criminal defense bar, and even members of the public were keenly aware of the problems

STATE v. SPIVEY

[357 N.C. 114 (2003)]

created by the burgeoning court docket at the time. In fact, *barely two months after the disposition of defendant's case*, the shroud of judicial protocol was breached when a visiting superior court judge and the resident superior court judge openly feuded in the media over the cause of the docket backlog. The public record reflects that Robeson County Senior Resident Superior Court Judge Dexter Brooks lambasted visiting Senior Superior Court Judge William Gore, Jr. for violating local court rules by scheduling cases for trial before the defendants had been arraigned. *Judge Swats Colleague, DA*, Fayetteville Observer-Times (Fayetteville, N.C.), 27 August 1999, at 1B; *Visitors Feel Wrath of Superior Court Judge*, Morning Star (Wilmington, N.C.), 28 August 1999, at 2B. Some ten days earlier, Judge Brooks had issued a memorandum, with a copy to this Court, stating his belief that "[t]he public image of the criminal justice system is suffering" and suggesting that the district attorney had a "history of discovery violations" that had led to numerous continuances, longer trials, and vacated convictions. *Judge Swats Colleague, DA*, Fayetteville Observer-Times (Fayetteville, N.C.), 27 August 1999, at 1B; *accord Visitors Feel Wrath of Superior Court Judge*, Morning Star (Wilmington, N.C.), 28 August 1999, at 2B. Judge Gore responded by defending his actions as a means to move cases along, adding that, in his view, lengthy trial delays had become *de rigueur* in Robeson County. The county's criminal superior court "is essentially dysfunctional," Judge Gore said, "and this is a view that is shared by both the public defender and the district attorney." *Judge Swats Colleague, DA*, Fayetteville Observer-Times (Fayetteville, N.C.), 27 August 1999, at 1B; *accord Visitors Feel Wrath of Superior Court Judge*, Morning Star (Wilmington, N.C.), 28 August 1999, at 2B.

In my view, amid the cloud of circumstances of crowded dockets, one thing remains clear: The authority bestowed upon the duly elected district attorney carries with it the primary responsibility for ensuring that criminal defendants are tried in a timely manner. Pursuant to the then-controlling statute, N.C.G.S. § 7A-49.3, the district attorney controlled the calendaring of cases brought before the court. But his ability to control the court docket extends far beyond mere scheduling authority. The district attorney has at his disposal a wide variety of additional tools that are designed to help ensure the effective administration of criminal justice. The district attorney decides who shall be initially charged, drafts criminal indictments for submission to the grand jury, prepares informations, decides which cases are ripe for dismissal, negotiates pleas (and does so in a majority of cases), and most recently, was given the statutory authority to

decide which first-degree homicide cases warrant capital prosecu-
tion, N.C.G.S. § 15A-2004 (2002). As a consequence, when a break-
down in the system causes untoward delays that leave criminal
defendants waiting longer and longer for trial, it is the district attor-
ney's role that draws the greatest scrutiny. In the instant case, ample
evidence demonstrates that the district attorney either did not recog-
nize the problem of mounting delays or ignored it. Perhaps more
important, the evidence also shows, definitively, that the district
attorney failed to utilize any of the available mechanisms designed to
help combat the problem.

Thus, the ultimate conclusion is inescapable: The district attor-
ney neglected the statutory authority entrusted to him as a means to
ensure that defendant's constitutional guarantee of a speedy trial was
satisfied. Moreover, such neglect resulted in prejudice on two sepa-
rate fronts—to defendant and to the public at large. First, even
assuming *arguendo* that the majority correctly concluded that
defendant's *case* was not directly impaired by the delay, he certainly
endured the travails of an excessive pretrial incarceration and suf-
fered the anxiety, concern, and social stigma associated with being
accused without benefit of trial. Second, and even more important,
the circumstances of defendant's odyssey just as severely prejudiced
society's interests in the overall administration of justice, at least in
terms of adverse effect.

When a four-plus year period is deemed to be an acceptable delay
between the time of arrest and the time of case disposition, the
public's expectation of a fair expeditious resolution is severely com-
promised. Victims of crimes can, and do, suffer from a lack of vindi-
cation when circumstances of a trial delay allow criminal suspects to
evade possible conviction and punishment for their crimes. In addi-
tion, society undoubtedly suffers dearly when a defendant, after a
four-year delay, is ultimately found innocent because the odds of find-
ing and punishing the actual perpetrator fall precipitously in the
wake of such a delay.

Avoiding inordinate pretrial delays also serves society's inter-
ests by minimizing the costs associated with pretrial detention.
Preventing such delays also reduces the risks of repeat offenses
being committed by suspects who are out on bail before trial.
Moreover, the state's citizenry should find neither comfort nor any
sense of security in the majority's conclusion that a crowded docket,
even if legitimate, somehow justifies a four-year interim between
arrest and trial. I doubt the existence of a single citizen among us

STATE v. SPIVEY

[357 N.C. 114 (2003)]

who would find a 1,600-day delay acceptable if it were he, she, a son, or a daughter who was waiting for his or her day in court.

Finally, looking prospectively, I would suggest that it is this Court's responsibility to anticipate the possible ramifications of the majority's holding in this case. Does the potential cutoff point for pretrial delays even exist, if the day should come when our state's courts become so backlogged that seven- or even nine-year delays are accepted as commonplace? What becomes of the individual who gets caught up in the judicial quagmire, through no fault of his own, and winds up spending two years in jail awaiting trial for an offense that carries a maximum prison sentence of twenty-four months? In my view, considering the current budgetary constraints placed on the AOC and their direct impact on the courts, such a scenario is a far cry from being far-fetched.[2] Such a scenario would also be tantamount to imposing punishment without benefit of trial and conviction, which is, of course, contrary to the Sixth Amendment rights at issue. As a consequence, I feel it is the duty of this Court to try to stem the encroaching tides that are threatening to erode further a basic right that is squarely aimed at protecting the interests of both those persons who are accused of crimes *and* the society that charges them.[3]

---

2. In a recent address on the current state of the judiciary in North Carolina, Supreme Court Chief Justice I. Beverly Lake, Jr., emphasized that the state's trial courts: (1) have confronted significant caseload increases in the past decade, without benefit of commensurate additional resources with which to manage, schedule, and hear such cases; and (2) can expect to face similar caseload increases in the foreseeable future. Chief Justice I. Beverly Lake, Jr., *2003 State of the Judiciary to the North Carolina General Assembly* (delivered in print to the North Carolina General Assembly, Raleigh, N.C., 7 April 2003).

Much of the Chief Justice's address focused on the state court system's lagging budget allocations—which account for less than three percent of the state's overall budget—and how inadequate funding has contributed to the slowdown in resolving cases. At present, numerous criminal suspects both in Robeson County and across the state remain in county jails awaiting trial. Although there has been no particular study quantifying the ever-increasing delay times between arrest and trial for serious felonies, it is apparent that the interim between the two events has increased significantly in recent years.

At some point—now, in my view—the legislature and the courts will have to face up to the reality that mere budgetary constraints can no longer justify the existing, and still escalating, waiting periods for criminal defendants. In other words, crowded dockets, as an excuse for trial delays, must eventually yield to both a suspect's Sixth Amendment right to a speedy trial and the public's expectation of timely justice.

3. I find it noteworthy that the United States Supreme Court, in *Barker v. Wingo*, recognized the American Bar Association's concomitant efforts to clarify, if not crystalize, both the law and underlying policies concerning speedy trials. The Court cited

**STATE v. SPIVEY**

[357 N.C. 114 (2003)]

While I recognize that the obvious and enduring problems in Robeson County's courts may make them an easy mark for criticism, my emphasis remains focused on using the courts' example as a means to emphasize those changes that will help to undermine the *status quo*. The existing tandem of the General Rules of Practice for the Superior and District Courts, the local court rules, the criminal procedure statutes, and this Court's many decisions on trial procedures provide an ample yet flexible framework by which court participants may proceed in a manner that comports with constitutional requirements. Thus, the law is in place. However, the law's inherent flexibility must not be stretched in a fashion that permits participants to ignore its preliminary steps or its ultimate mandate. All participants—from trial judge to district attorney to defense counsel—must be encouraged to work together, and in good faith, in order to ensure that those suspected of crimes receive timely attention. If nothing else, the case *sub judice* reveals the myriad of problems that emerge when participants fail to abide by existing rules while they continue their respective pursuits of individual agendas. The case is also emblematic of a court system that has, for all intents and purposes, crippled itself through complacency.

In summation, I conclude that the four-plus year delay between defendant's arrest and the disposition of defendant's case, when coupled with the State's failure to justify its inaction during that period, resulted in prejudice to both defendant's interests in a speedy trial and society's interests in the timely resolution of criminal cases. More specifically, in applying the four factors of the *Barker* test, I would

---

to the ABA's *Project on Standards for Criminal Justice, Speed Trial* (approved draft 1968), three times in its opinion, using the ABA's proposals as guideposts for its analysis. 407 U.S. at 523 n.17, 523 n.19, 528 n.28, 33 L. Ed. 2d at 112 n.17, 113 n.19, 115 n.28.

In February 2003, the ABA began circulating a new draft proposal for changes in speedy trial rules. The proposal aims to reverse the trend of expanded time periods between arrest and trial by establishing what in essence amounts to stricter standards and enforcement mechanisms.

Although I express no opinion here as to whether the adoption of the proposed rules will prove helpful or effective in alleviating the trial delay problem, I note that the revisions were prompted by the ABA's developing view that its existing standards "focused almost exclusively on the defendant's right to a speedy trial" and that "greater attention should be given to the interests of the public . . . in expeditious case resolution." *Speedy Trial and Timely Resolution of Criminal Cases* 1 (ABA draft proposal, February 2003). Such interests were outlined by the United States Supreme Court in *Barker*, are reiterated in this opinion (as the five societal interests in the effective administration of justice), and stand as a major consideration for my efforts to reverse the current trend of ever-expanding intervals between the arrest of criminal suspects and their respective trials.

conclude: (1) that the four-plus year delay qualifies as "presumptively prejudicial," *Doggett v. United States*, 505 U.S. 647, 652 n.1, 120 L. Ed. 2d 520, 528 n.1 (1992), thereby triggering examination of the remaining three factors; (2) that defendant has met his burden of showing that the reason for the delay was caused by the neglect of the prosecution (in sum, the State's inaction and/or indifference during the delay period); (3) that whether or not defendant asserted his right to a speedy trial in 1995, via *pro se* petition, or through his attorney, by motion in 1997, he asserted the said right in a timely fashion and thus this factor weighs in his favor; and (4) that the findings pertaining to the first three factors demonstrate prejudice to defendant (and to society's interest in the timely resolution of criminal cases). As a result, I would hold that defendant was unequivocally denied his right to a speedy trial, as guaranteed under the Sixth Amendment to the United States Constitution and Article I, Section 18 of the North Carolina Constitution, thereby requiring that the judgment of conviction be set aside. *Strunk v. United States*, 412 U.S. 434, 440, 37 L. Ed. 2d 56, 61-62 (1973) (holding that setting aside a conviction is the sole remedy for a speedy trial violation). Therefore, I would remand the case to the Court of Appeals to direct the trial court to set aside its judgment, vacate the sentence, and dismiss the indictment.

Justice ORR joins in this dissenting opinion.