IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA16-465

 Filed: 20 December 2016

Onslow County, No. 13 CRS 55489

STATE OF NORTH CAROLINA,

 v.

JUSTON PAUL JOHNSON, Defendant.

 Appeal by Defendant from judgment entered 10 December 2015 by Judge

Beecher R. Gray in Onslow County Superior Court. Heard in the Court of Appeals 5

October 2016.

 Attorney General Roy Cooper, by Assistant Attorney General James D.
 Concepcion, for the State.

 Parish & Cooke, by James R. Parish, for Defendant-Appellant.

 INMAN, Judge.

 A criminal defendant whose trial is delayed because of a backlog of forensic

laboratory testing and who does not properly assert his speedy trial right until a trial

has been scheduled has not been deprived of his constitutional right to a speedy trial.

 Juston Paul Johnson (“Defendant”) appeals from a judgment finding him guilty

of assault with a deadly weapon inflicting serious injury with an enhancement that

at the time of the commission of the felony, Defendant was in possession or wore a

bulletproof vest. Defendant argues he was denied a fair and speedy trial, and that
 STATE V. JOHNSON

 Opinion of the Court

the trial court erred in failing to dismiss the assault with a deadly weapon inflicting

serious injury charge and the enhancement for the bulletproof vest for insufficient

evidence. After careful review, we conclude that Defendant received a trial free of

constitutional or other error.

 Factual & Procedural Background

 Evidence presented at trial tended to show the following:

 Shortly after 9:15 pm on Friday, 23 August 2013, Anthony Sutton (“Mr.

Sutton”) had just parked his vehicle and was walking in the parking lot outside his

apartment at 400 Hammock Lane in Jacksonville when a man wearing a bulletproof

vest and gloves drew a gun and pointed it at his face. Mr. Sutton struck the man in

the face and ran into the backyard of his apartment building. Mr. Sutton then heard

a pop and felt a stinging sensation in the back of his left leg. He continued running

until he lost feeling in his left leg and fell to the ground. The man with the gun

jumped on Mr. Sutton, asked him if he wanted to die, and fired another shot. Mr.

Sutton felt a burning sensation in his head like the feeling in his leg and believed he

had been shot in the head.

 Mr. Sutton grabbed the gun and fought with his assailant for it. Mr. Sutton

then noticed another person in the yard, whom he at first thought was a neighbor

coming to help him. But the other person joined in the fight, grabbed Mr. Sutton’s

hand that was on the gun, and placed a handcuff on Mr. Sutton’s wrist. The person

 -2-
 STATE V. JOHNSON

 Opinion of the Court

tried to handcuff both of Mr. Sutton’s wrists, but Mr. Sutton punched him in the

chest. The person with the handcuffs then put his hand inside Mr. Sutton’s shorts

and reached for his keys, then fell or moved to the ground, and then ran away. Mr.

Sutton and the man with the gun continued to struggle, and Mr. Sutton heard his

children screaming. At that point, Mr. Sutton released his grasp on the gun and tried

to run toward the building. He then heard a third shot, his right leg went numb, and

he fell again. After a few seconds, Mr. Sutton got up and ran to the front of the

building. He reached the front of the adjacent apartment building, 600 Hammock

Lane, when other people tackled him, told him to sit down, and began giving him first

aid.

 Mr. Sutton did not recognize either of his assailants. Although he saw that the

man with the gun was wearing a bulletproof vest, he did not notice whether the

second man was wearing a vest. When he hit the second man in the chest, “it didn’t

feel like flesh. It felt like it was padded. But [he didn’t] really know what [the man]

on.”

 Jacksonville police officers responded to a 911 call reporting shots fired outside

of Mr. Sutton’s apartment building and stopped a vehicle they encountered driving

away from the call location. Inside the vehicle they found Latasha Sutton (‘”Ms.

Sutton”), Mr. Sutton’s estranged wife, in the driver’s seat; Defendant in the front

passenger seat; and Dwayne Robinson (“Mr. Robinson”) in a rear passenger seat. A

 -3-
 STATE V. JOHNSON

 Opinion of the Court

child was sitting in Ms. Sutton’s lap and another child was sitting in the backseat

near Mr. Robinson. Officers found a handgun belonging to Defendant in the center

console. Officers found another handgun, which had recently been fired, under the

floorboard of the backseat where Mr. Robinson was sitting. Officers also found a set

of walkie talkies turned on and set to the same channel, a map, handcuffs, rope, and

three or four bulletproof vests in the vehicle. One bulletproof vest was on the front

floorboard on the right passenger side where Defendant was sitting at the time police

stopped the vehicle.

 Defendant was ordered to exit the vehicle and was arrested and searched at

the scene. Police found in his possession a pair of handcuffs and ten handcuff keys

on a key chain. Police ultimately confiscated Defendant’s pants. Forensic testing

later determined that the pants were stained with Mr. Sutton’s blood.

 Police removed Ms. Sutton, Mr. Robinson, and the children from the vehicle.

Ms. Sutton told one of the officers, “[n]one of this would have happened if you would

have done your job yesterday.” The officer recognized Ms. Sutton and Defendant from

his response to a domestic disturbance call at the same location a day earlier, on 22

August 2013. Ms. Sutton told police on that date that she was entitled to take custody

of her children, who were in Mr. Sutton’s apartment. Police officers were unable to

assist Ms. Sutton and instructed her and Defendant to leave.

 -4-
 STATE V. JOHNSON

 Opinion of the Court

 Lawrence Herndon (“Mr. Herndon”), Mr. Sutton’s next-door neighbor, was in

his apartment on the evening of 23 August 2013 when he heard a loud popping noise.

When he heard another pop, Mr. Herndon went to the back window of his apartment

and saw three people struggling outside about 20 feet away. He saw one of the three

people standing up above another person on the ground, pointing the gun down at

the person’s neck. He saw the third person going through the pockets of the person

who was on the ground. Mr. Herndon told his wife to call 911 and heard another

gunshot and saw someone, whom he later identified as Defendant, running toward

the front of the area between his building and an adjacent apartment building. Mr.

Herndon then heard a woman and children screaming, and when he opened his front

door, he heard someone say “they took the kids.” Mr. Herndon walked outside his

front door and found Mr. Sutton lying on the sidewalk. Mr. Herndon then realized

that Mr. Sutton was one of the three people who had been struggling in the back of

the building. Mr. Herndon noticed that Mr. Sutton was handcuffed and bleeding.

 Jacksonville police officers arrived within a few minutes of the 911 call.

Officers asked Mr. Herndon if he could identify one or more of three people standing

in front of a patrol car. Mr. Herndon identified Mr. Robinson as the person who had

been holding the gun to Mr. Sutton’s neck and he identified Defendant as the person

who was reaching into Mr. Sutton’s pockets when Mr. Robinson was holding the gun

 -5-
 STATE V. JOHNSON

 Opinion of the Court

on Mr. Sutton’s neck. Mr. Herndon noticed that the man with the gun was wearing

a bulletproof vest. He did not recall seeing Defendant wearing a bulletproof vest.

 After being advised of his Miranda rights, Defendant provided a written

statement to police providing the following information: Defendant had come with

Ms. Sutton to Mr. Sutton’s apartment complex in Jacksonville on 22 August 2013 to

pick up Ms. Sutton’s children. Mr. Sutton refused to let Ms. Sutton take the children.

The next day, 23 August 2013, Ms. Sutton told Defendant that Mr. Sutton had

violated a restraining order and that he was on probation. Defendant returned to

Mr. Sutton’s apartment complex that evening with the understanding that Ms.

Sutton had legal authority to take custody of the children because Mr. Sutton had

violated his probation. Defendant’s friend, Mr. Robinson, also rode with them, and

they agreed that Ms. Sutton would drive the vehicle back to Fayetteville after picking

up the children. After the vehicle was parked at the apartments, Mr. Robinson

stepped out. Defendant was sitting in the vehicle with Ms. Sutton when he heard

gunshots. Defendant saw Ms. Sutton’s children outside the apartment building. He

put the children in the vehicle and waited with Ms. Sutton for Mr. Robinson. Mr.

Robinson then returned to the vehicle and they were in the process of leaving when

they were stopped by police.

 Defendant was arrested on the night of the shooting and on the following day

he was served with a warrant charging him with attempted first degree murder.

 -6-
 STATE V. JOHNSON

 Opinion of the Court

Defendant initially waived his right to court-appointed counsel, but eventually

counsel was appointed to represent him. On 13 October 2015, Defendant was charged

in a superseding indictment with attempted first degree murder, assault with a

deadly weapon with intent to kill inflicting serious injury, and wearing or having in

his immediate possession a bulletproof vest during the commission of the other

charged felonies. On 24 October 2013, DNA evidence was collected from Defendant.

From the time of his arrest until the jury returned verdicts of guilty on 10 December

2015, Defendant was held in custody under a bond set at more than $500,000.1

 On 14 November 2013, evidence including the pants Defendant wore on the

night of the shooting and the DNA sample collected from Defendant was submitted

to the State Bureau of Investigation Crime Lab for analysis. Having received no

results after more than a year, the State submitted a “rush request” with the Crime

Lab in January 2015. The Crime Lab released test results in May 2015 – more than

18 months after Defendant’s arrest. After the test results were released, the case was

set for trial, but the initial trial date of 5 October 2015 was continued at the request

of Defendant’s counsel to 9 November 2015.

 On 23 September 2015, Defendant’s counsel filed a motion to withdraw from

the representation on the basis that he had been discharged by Defendant. On 2

 1 In a motion filed 2 October 2015 Defendant’s counsel asserted that the bond amount was
$750,000. The record does not include a bond order entered by the trial court.

 -7-
 STATE V. JOHNSON

 Opinion of the Court

October 2015, the same counsel filed a motion to dismiss the charges based on the

alleged violation of Defendant’s right to a speedy trial.

 On 28 October 2015, again at the request of Defendant’s counsel, the trial court

postponed the trial from 9 November 2015 to 7 December 2015.

 On 7 December 2015, Defendant informed the trial court that he wanted his

counsel to continue representing him. The trial court then conducted a hearing on

Defendant’s speedy trial motion, orally denied the motion, and proceeded to impanel

a jury for trial. Defendant gave notice of appeal in open court.

 Analysis

I. Speedy Trial Motion

 Defendant contends the trial court erred in denying his motion to dismiss the

charges against him based on the State’s violation of his constitutional right to a

speedy trial. We affirm the trial court’s ruling.

 The denial of a motion to dismiss on speedy trial grounds presents a question

of constitutional law subject to de novo review. State v. Graham, 200 N.C. App. 204,

214, 683 S.E.2d 437, 444 (2009). We therefore consider the matter anew and

substitute our judgment for that of the trial court. State v. Williams, 362 N.C. 628,

632-33, 669 S.E.2d 290, 294 (2008).

 The United States Supreme Court in Barker v. Wingo, 407 U.S. 514, 33 L. Ed.

2d 101 (1972), established a four-part test to determine if a defendant had been

 -8-
 STATE V. JOHNSON

 Opinion of the Court

denied his constitutional right to a speedy trial. Id. at 530, 33 L. Ed. 2d at 116-17.

The four factors are (1) the length of delay between accusation (by indictment or

arrest) and trial; (2) the reason(s) for the delay; (3) the defendant’s assertion of his

right to a speedy trial; and (4) prejudice to the defendant resulting from the delay.

Id. No single factor is dispositive; “[r]ather, they are related factors and must be

considered together with such other circumstances as may be relevant.” Id. at 533,

33 L. Ed. 2d at 118. The North Carolina Supreme Court expressly adopted the Barker

factors in State v. Grooms, 353 N.C. 50, 62, 540 S.E.2d 713, 721 (2000), and noted

that the same analysis applies to speedy trial claims asserted under Article I, Section

18 of the North Carolina Constitution.

 Defendant notes that the trial court failed to articulate any findings of fact or

conclusions of law. But the absence of findings and conclusions does not preclude

review by this Court because none of the evidence relevant to Defendant’s speedy

trial motion was disputed. See State v. Chaplin, 122 N.C. App. 659, 663-64, 471

S.E.2d 653, 656 (1996) (“The information before the trial court is not in dispute and

thus the failure of the trial court to make findings of fact does not prevent review by

this Court.”). Reviewing the undisputed evidence of record we proceed to apply the

Barker analysis.

A. Length of Delay

 -9-
 STATE V. JOHNSON

 Opinion of the Court

 The length of delay between accusation and trial does not per se determine

whether a defendant has been denied his speedy trial rights. Grooms, 353 N.C. at

62, 540 S.E.2d at 721. The United States Supreme Court has noted that a delay

approaching one year “marks the point at which courts deem the delay unreasonable

enough to trigger the Barker enquiry.” Doggett v. United States, 505 U.S. 647, 652 n.

1, 120 L. Ed. 2d 520, 528 n. 1 (1992). In this case, Defendant was arrested and

remained incarcerated for nearly 28 months before he was tried. This delay raises

the question of reasonableness and requires us to consider the additional factors.

B. Reason for the Delay

 “[D]efendant has the burden of showing that the delay [of his trial] was caused

by the neglect or willfulness of the prosecution.” Grooms, 353 N.C. at 62, 540 S.E.2d

at 721. If Defendant makes a prima facie showing that the delay resulted from

neglect or willfulness by the State, the burden shifts to the State to provide a neutral

explanation for the delay. State v. Spivey, 357 N.C. 114, 119, 579 S.E.2d 251, 255

(2003).

 It is undisputed that the last four months of the delay of Defendant’s trial

resulted from his trial counsel’s scheduling conflicts. It also appears that Defendant

initially waived his right to appointed counsel but failed to retain counsel, so that

counsel was appointed and first appeared for Defendant more than a month after his

arrest. Seven months after his arrest, Defendant complained that his counsel had

 - 10 -
 STATE V. JOHNSON

 Opinion of the Court

not spoken with him in two months. Ultimately, Defendant filed a pro se motion for

appointment of new counsel, and Defendant’s counsel filed a motion to withdraw from

the representation. Delay caused by Defendant’s indecision about counsel, counsel’s

lapse in communicating with Defendant, and counsel’s scheduling conflicts should

not be weighed against the State.

 The primary cause of Defendant’s delayed trial was a backlog at the State

Bureau of Investigation’s Crime Lab. The prosecution submitted evidence (including

DNA evidence collected from Defendant after counsel was appointed to represent him

in October 2013) to the Crime Lab for testing on 14 November 2013. The Crime Lab

did not issue test results for another 18 months, in May 2015. Although the

prosecution submitted a “rush request” with the Crime Lab in January 2015, it was

not until April 2015 that the evidence was first tested for the presence of blood and

other bodily fluids. When asked why testing did not start for more than a year after

the evidence was submitted, Martha Traugott, a forensic scientist with the Crime

Lab, testified that “[i]tems are usually worked in the order that we receive them.”

Erin Ermish, another Crime Lab scientist, testified that she first received evidence

gathered in this case on 7 May 2015 and proceeded to conduct a DNA analysis. That

was a few weeks before the Crime Lab issued its report. Ms. Ermish acknowledged

that the State had submitted a “rush request” in January 2015. Asked by counsel for

Defendant if she could explain the long delay in testing, Ms. Ermish testified that

 - 11 -
 STATE V. JOHNSON

 Opinion of the Court

“due to the number of cases that had previously been submitted that were waiting to

be worked, this case would have been worked in order when it was – when we go to

that number.”

 When considering the factor of the reason for a delayed trial, “different weights

should be assigned to different reasons.” Barker, 407 U.S. at 531, 33 L. Ed. 2d at 117.

More specifically:

 A deliberate attempt to delay the trial in order to hamper
 the defense should be weighed heavily against the
 government. A more neutral reason such as negligence or
 overcrowded courts should be weighed less heavily but
 nevertheless should be considered since the ultimate
 responsibility for such circumstances must rest with the
 government rather than with the defendant. Finally, a
 valid reason, such as a missing witness, should serve to
 justify appropriate delay.
Id.

 Defendant has not argued that the State deliberately delayed his trial, much

less that the State delayed the trial to hamper his defense. Defendant concedes in

his brief that “it is unclear the State had the ability to speed up” the testing process.

 The undisputed testimony by Crime Lab scientists regarding a backlog of

evidence to be tested provides an explanation analogous to that offered in State v.

Hammonds, 141 N.C. App. 152, 160, 541 S.E.2d 166, 173 (2000), in which the trial

court found that a congested court docket in Robeson County delayed the defendant’s

murder trial for more than four years following his arrest. Id. at 160, 541 S.E.2d at

173. “ ‘Our courts have consistently recognized congestion of criminal court dockets

 - 12 -
 STATE V. JOHNSON

 Opinion of the Court

as a valid justification for delay.’ ” Id. (quoting State v. Hughes, 54 N.C. App. 117,

119, 282 S.E.2d 504, 506 (1981)). Unlike the management of a criminal court docket,

which is within the control of the prosecutor, the management of a backlog of evidence

to be tested is within the control of a separate agency, in this case the State Bureau

of Investigation. While we acknowledge the holding in Barker that governmental

responsibility for delay should be weighed against the State, Defendant has failed to

make a prima facie showing that either the prosecution or the Crime Lab negligently

or purposefully underutilized resources available to prepare the State’s case for trial.

For these reasons, we conclude that the 18 months used by the Crime Lab to process

forensic testing of evidence in this case was a neutral reason for Defendant’s delayed

trial. See also State v. Goins, 232 N.C. App. 451, 453, 754 S.E.2d 195, 198 (2014)

(concluding that a backlog at the Crime Lab was among “neutral” reasons for delay

of the defendant’s trial). Accordingly, this factor of the Barker analysis does not weigh

in favor of Defendant.

C. Defendant’s Assertion of His Right to a Speedy Trial

 The third factor to consider is whether and when a criminal defendant has

asserted his right to a speedy trial. “The more serious the deprivation, the more likely

a defendant is to complain. The defendant’s assertion of his speedy trial right, then,

is entitled to strong evidentiary weight in determining whether the defendant is

being deprived of the right.” Barker, 407 U.S. at 531-32, 33 L. Ed. 2d at 117-18. A

 - 13 -
 STATE V. JOHNSON

 Opinion of the Court

defendant is not required to assert his right to a speedy trial in order to make a speedy

trial claim on appeal. Grooms, 353 N.C. at 63, 540 S.E.2d at 722. But a defendant’s

failure to assert his speedy trial right, or his failure to assert the right sooner in the

process, “does weigh against his contention that he has been denied his constitutional

right to a speedy trial.” Id. Here, Defendant first asserted his speedy trial right more

than a year after he was arrested, and he did not properly2 assert his right until

October 2015 – more than two years after his arrest, after the State had obtained

forensic test results from the Crime Lab, after the trial court had set the case for trial,

and after Defendant’s trial counsel had requested the trial date be continued. The

eleventh-hour nature of Defendant’s speedy trial motion carries minimal weight in

his favor.

D. Prejudice to Defendant

 The final factor to consider is prejudice to Defendant caused by the delay

between his arrest and trial. “A defendant must show actual, substantial prejudice.”

Spivey, 357 N.C. at 122, 579 S.E.2d at 257. The constitutional right to a speedy trial

addresses three concerns: “(i) to prevent oppressive pretrial incarceration; (ii) to

 2 Defendant filed a pro se motion to dismiss claiming that his right to a speedy trial had been
violated on 30 March 2015. “Having elected for representation by appointed defense counsel,
defendant cannot also file motions on his own behalf or attempt to represent himself. Defendant has
no right to appear both by himself and by counsel.” Grooms, 353 N.C. at 61, 540 S.E.2d at 721; see
also Spivey, 357 N.C. at 121, 579 S.E.2d at 256 (holding that where the defendant was represented by
counsel throughout his pretrial incarceration, and counsel did not file a speedy trial motion for nearly
three years after the defendant’s arrest, the “defendant’s pro se assertion of his right to a speedy trial
is not determinative of whether he was denied the right[]”).

 - 14 -
 STATE V. JOHNSON

 Opinion of the Court

minimize anxiety and concern of the accused; and (iii) to limit the possibility that the

defense will be impaired.” Grooms, 353 N.C. at 63, 540 S.E.2d at 722 (citations and

quotation marks omitted). Of these concerns, most important “is whether the

prosecutor’s delay hampered defendant’s ability to present his defense[.]” State v.

Hughes, 54 N.C. App. 117, 120, 282 S.E.2d 504, 506 (1981).

 In Hughes, the defendant contended that because of delay, he could no longer

contact three alibi witnesses, but he presented no evidence about when the witnesses

became unavailable. 54 N.C. App. at 120, 282 S.E.2d at 506-07. This Court held that

“[b]ecause [the] defendant has not demonstrated that his witnesses were available at

any earlier time, we cannot conclude that the prosecutor’s delay caused him

prejudice.” Id. at 120, 282 S.E.2d at 507.

 Defendant here contends that several witnesses’ memories were affected by

the delay between his arrest and trial. For example, he notes that Mr. Herndon could

not recall seeing Defendant wearing a bulletproof vest. Defendant contends that the

lack of recall could have exculpated Defendant had it been presented when the

witness’s memory was clearer. However, without evidence that the witness would

have testified more positively for Defendant at an earlier time, this Court can only

speculate whether the lack of recall hampered the defense or the prosecution. See

Barker, 407 U.S. at 534, 33 L. Ed. 2d at 119 (holding that the defendant’s right to

speedy trial was not violated when the trial transcript revealed only “very minor”

 - 15 -
 STATE V. JOHNSON

 Opinion of the Court

memory lapses, and noting that one lapse was by a prosecution witness). Defendant

also contends that because he was incarcerated, he was unable to confer adequately

with his counsel. However, given Defendant’s inability to obtain release on bond, we

cannot conclude that Defendant would have obtained noncustodial contact with his

counsel had his trial proceeded sooner.

 Considering all of the Barker factors, we conclude that Defendant has failed to

show that his constitutional right to a speedy trial was violated. We therefore affirm

the trial court’s denial of Defendant’s motion to dismiss on that ground.

II. Acting in Concert

 Defendant argues that the trial court erred in denying his motion to dismiss

the charge of assault with a deadly weapon inflicting serious injury, because the

evidence was insufficient to support that charge against him. We disagree.

 We review de novo a trial court’s denial of a defendant’s motion to dismiss.

State v. Smith, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). The test is “whether

there is substantial evidence (1) of each essential element of the offense charged, or

of a lesser offense included therein, and (2) of defendant’s being the perpetrator.”

State v. Fritsch, 351 N.C. 373, 378, 526 S.E.2d 451, 455 (2000) (quotation marks and

citation omitted). “Substantial evidence is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.” State v. Smith, 300 N.C. 71,

78-79, 265 S.E.2d 164, 169 (1980). We review the evidence in the light most favorable

 - 16 -
 STATE V. JOHNSON

 Opinion of the Court

to the State, drawing every reasonable inference in the State’s favor. State v. Rose,

339 N.C. 172, 192, 451 S.E.2d 211, 213 (1994). On the other hand, evidence which

raises no more than a surmise, suspicion, or conjecture of guilt is insufficient to

withstand the motion to dismiss even though the suspicion so aroused by the evidence

is strong. State v. Evans, 279 N.C. 447, 453, 183 S.E.2d 540, 544 (1971).

 If there is substantial evidence—whether direct, circumstantial, or both—to

support a finding that the offense charged has been committed and that the defendant

is the perpetrator, the motion to dismiss should be denied. State v. McNeil, 359 N.C.

800, 804, 617 S.E.2d 271, 274 (2005). When considering circumstantial evidence,

 the question for the court is whether a reasonable inference
 of defendant’s guilt may be drawn from the circumstances.
 If so, it is for the jury to decide whether the facts, taken
 singly or in combination, satisfy them beyond a reasonable
 doubt that the defendant is actually guilty.

State v. Thomas, 296 N.C. 236, 244, 250 S.E.2d 204, 209 (1978) (citations omitted).

 To withstand a motion to dismiss a charge of assault with a deadly weapon

inflicting serious injury, the State must produce substantial evidence that the

defendant (1) assaulted the victim, (2) with a deadly weapon, (3) inflicting serious

injury. State v. Allen, 193 N.C. App. 375, 378, 667 S.E.2d 295, 297-98 (2008). The

term “serious injury” is defined by statute as physical or bodily injury resulting from

an assault with a deadly weapon. State v. Wallace, 197 N.C. App. 339, 347-48, 676

S.E.2d 922, 928 (2009); see also N.C. Gen. Stat. § 14-32 (2015).

 - 17 -
 STATE V. JOHNSON

 Opinion of the Court

 Here, jurors were provided sufficient evidence from which they could

reasonably infer all of the factual elements of the charge against Defendant.

Evidence that Mr. Sutton was shot three times with a gun and required

hospitalization and surgery for his wounds satisfies the elements of assault with a

deadly weapon and infliction of serious injury. The closer question is whether the

evidence was sufficient to allow a reasonable inference that Defendant was a

perpetrator of the crime.

 It is undisputed that Mr. Robinson, and not Defendant, shot Mr. Sutton. So

Defendant could only be found guilty of assaulting Mr. Sutton with a deadly weapon

inflicting serious injury based upon a theory of acting in concert. The theory of acting

in concert extends criminal liability to a person who, although not the perpetrator of

a crime, joins with the perpetrator in a common purpose which results in the crime.

 If two persons join in a purpose to commit a crime, each of
 them, if actually or constructively present, is not only
 guilty as a principal if the other commits that particular
 crime, but he is also guilty of any other crime committed by
 the other in pursuance of the common purpose . . . or as a
 natural or probable consequence thereof.

State v. Mann, 355 N.C. 294, 306, 560 S.E.2d 776, 784 (2002) (citations omitted).

 The evidence presented at trial established the following facts: Defendant and

Ms. Sutton, who lived in Fayetteville, drove on a Thursday to Mr. Sutton’s residence

in Jacksonville, where the Suttons engaged in a dispute over custody of their children

until police arrived and required Defendant and Ms. Sutton to leave without the

 - 18 -
 STATE V. JOHNSON

 Opinion of the Court

children. The next evening, Defendant drove his vehicle, along with Mr. Robinson

and Ms. Sutton, from Fayetteville back to Mr. Sutton’s residence in Jacksonville,

carrying in the vehicle firearms, bulletproof vests, and walkie talkie radios that were

turned on and set to the same channel. The vehicle was waiting in Mr. Sutton’s

apartment parking lot when he arrived home that evening. Mr. Robinson, who did

not know Mr. Sutton, shot Mr. Sutton and asked him if he wanted to die. Defendant

assisted Mr. Robinson in restraining Mr. Sutton, placed a handcuff on one of Mr.

Sutton’s wrists, tried without success to cuff both of Mr. Sutton’s wrists, searched Mr.

Sutton’s pockets, and escorted the Suttons’ children from Mr. Sutton’s apartment to

the vehicle where Ms. Sutton was waiting. After neighbors found Mr. Sutton bleeding

from gunshot wounds, Defendant sped away from the scene in the vehicle with Ms.

Sutton, Mr. Robinson, and the children.

 This evidence allows a reasonable inference that Defendant brought Mr.

Robinson to Jacksonville, armed and equipped with bulletproof vests and walkie

talkies, to take the children away from Mr. Sutton by force. Taking children by force

and against the will of their custodial parent is a crime. Although it may have been

possible for Defendant to take the children without confronting Mr. Sutton, without

using a gun, a bulletproof vest, or a walkie talkie to communicate with a partner, a

natural consequence of the purpose included a confrontation and use of weapons and

other equipment available to Defendant and Mr. Robinson at the crime scene.

 - 19 -
 STATE V. JOHNSON

 Opinion of the Court

 Defendant argues that absent evidence that he was “anywhere near” Mr.

Robinson when the shots were fired “or in a position to assist or even waiting to assist”

him during the shooting, the evidence was insufficient to show that he was present

during the crime. We are unpersuaded. Mr. Sutton’s blood was found on Defendant’s

pants. Defendant had traveled from another county for the second time in two days

to visit the home of his girlfriend’s estranged husband following a custody dispute.

Defendant had in his possession several sets of handcuffs and a firearm. After Mr.

Robinson first shot Mr. Sutton, and while Mr. Robinson and Mr. Sutton were

struggling over the gun, Defendant aided Mr. Robinson in the assault. The North

Carolina Supreme Court has held:

 One who procures or commands another to commit a
 felony, accompanies the actual perpetrator to the vicinity
 of the offense and, with the knowledge of the actual
 perpetrator, remains in that vicinity for the purpose of
 aiding and abetting in the offense and sufficiently close to
 the scene of the offense to render aid in its commission, if
 needed, or to provide a means by which the actual
 perpetrator may get away from the scene upon the
 completion of the offense, is a principal in the second
 degree and equally liable with the actual perpetrator.

State v. Price, 280 N.C. 154, 158, 184 S.E.2d 866, 869 (1971).

 It would have been reasonable for a finder of fact to infer from the evidence

presented at trial that Defendant intended to assist his girlfriend in taking her

children against the will of her estranged husband, that Defendant sought and

obtained the assistance of Mr. Robinson, and that they brought to Mr. Sutton’s

 - 20 -
 STATE V. JOHNSON

 Opinion of the Court

address weapons and other equipment for the purpose of succeeding in the effort that

had failed the previous day.

 Based on the reasonable inferences arising from the evidence presented at

trial, we conclude that the trial court did not err in denying Defendant’s motion to

dismiss the charge of assault with a deadly weapon inflicting serious injury.

III. Bulletproof Vest Enhancement

 Defendant argues that the trial court erred in denying his motion to dismiss

the charge that he committed assault while wearing or having in his immediate

possession a bulletproof vest. We disagree.

 Mr. Sutton testified at trial that he could not see what Defendant was wearing

during the assault, but that when he punched Defendant’s chest, it felt padded. A

police officer who interviewed Mr. Sutton at the hospital testified that Mr. Sutton

told him both attackers wore bulletproof vests. Police who stopped Defendant’s

vehicle immediately following the shooting found a bulletproof vest lying on the floor

of the front passenger side of the vehicle where Defendant was sitting. This evidence

was sufficient to allow a reasonable inference that Defendant either wore or had in

his immediate possession a bulletproof vest during the assault. For this reason, the

trial court did not err in denying Defendant’s motion to dismiss the enhancement

charge.

 Conclusion

 - 21 -
 STATE V. JOHNSON

 Opinion of the Court

 For all of the reasons explained above, we conclude that the trial court did not

violate Defendant’s constitutional right to a speedy trial and that Defendant has

failed to demonstrate any error in his trial.

 NO ERROR.

 Judges DAVIS and ENOCHS concur.

 - 22 -